1  JUSTIN M. GOLDSTEIN (SBN 198858)
   jgoldstein@carlsmith.com
2  MICHELLE L. HAN (SBN 285091)
   mhan@carlsmith.com
3  CARLSMITH BALL LLP
   515 South Flower Street, Suite 2900
4  Los Angeles, CA 90071-2901
   Telephone: 213.955.1200
5  Facsimile: 213.623.0032

6  Attorneys for Defendants
   ABC Signature Studios, Inc.,
7  Khalabo Ink Society, and Kenya Barris

8

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11

12  DAVID LLOYD MARCUS, an            Case No. 2:17-cv-00148 RSWL (AJWx)
    individual,
13                                    **DEFENDANTS ABC SIGNATURE
                 Plaintiff,           STUDIOS, INC., KHALABO INK
14                                    SOCIETY, AND KENYA BARRIS'
    v.                                NOTICE OF MOTION AND
15                                    MOTION TO DISMISS PURSUANT
    ABC SIGNATURE STUDIOS, INC., a    TO FED. R. CIV. P. 12(B)(6);
16  Delaware corporation; KHALABO     MEMORANDUM OF POINTS AND
    INK SOCIETY, a Delaware           AUTHORITIES**
17  corporation; KENYA BARRIS, an
    individual; and DOES 1 through 10, *Filed or lodged concurrently herewith*:
18  inclusive,                        (1) Declaration of Justin M. Goldstein in
                                      Support of Motion;
19               Defendants.          (2) Notice of Lodging;
                                      (3) Request for Judicial Notice;
20                                    (4) [Proposed] Order Re Motion to
                                      Dismiss;
21                                    (5) [Proposed] Order re Request for
                                      Judicial Notice
22
                                      Date:       July 25, 2017
23                                    Time:       10:00 a.m.
                                      Courtroom:  TBD
24                                    Judge:      Hon. Ronald S. W. Lew

25

26

27

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4828-1383-4053.4

DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)

**TO PLAINTIFF AND ITS ATTORNEYS:**

PLEASE TAKE NOTICE that on July 25, 2017,[1] at 10:00 a.m., or as soon thereafter as the matter can be heard in the above-entitled Court, defendants ABC Signature Studios, Inc., Khalabo Ink Society, and Kenya Barris (collectively, "Defendants") will and hereby do move the Court for an order dismissing plaintiff David Lloyd Marcus' ("Plaintiff") claims for copyright infringement, unfair competition under the Lanham Act, and declaratory and injunctive relief, pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).

Each of the four causes of action asserted against Defendants in the Complaint should be dismissed on a variety of grounds.  The First Cause of Action for copyright infringement is untenable because Plaintiff fails to plead (and cannot possibly plead) any legally protectable similarities between his work and *Black-ish*. The Second Cause of Action for unfair competition under the Lanham Act is a repackaged copyright claim, which is barred by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) and its progeny.  The Fourth Cause of Action for declaratory relief seeks only a determination that Defendants violated Plaintiff's copyright interests.  Where, as here, a claim for declaratory relief is entirely duplicative of a copyright claim, it should be dismissed (whether or not the copyright claim is sustainable).  Moreover, if the copyright claim is dismissed, so too must the declaratory relief claim that mirrors it.  The Fifth Cause of Action for

---

[1] Defendants set this Motion for hearing on July 25 for two reasons.  First, the hearing date takes into account that Plaintiff's current counsel are seeking to withdraw.  (Dkt. 31.)  Their Motion to Withdraw is set for hearing on June 13.  If that Motion is granted, Plaintiff will have an opportunity to seek assistance from new counsel (if any) in advance of his opposition deadline for this Motion.  Second, the hearing date will allow the Court to concurrently hear and decide both the present Motion along with Defendants' intended Motion to Strike and for Sanctions pursuant to Federal Rule of Civil Procedure 11.  Consistent with Rule 11(c)(2), that Motion is being served on Plaintiff's counsel, and will be filed with the Court following the required 21 day period unless this action is dismissed before then.

1  injunctive relief should also be dismissed because an injunction is a remedy and not

2  an independent claim for relief.

3     Defendants' Motion will be based on this Notice of Motion and Motion, the

4  attached Memorandum of Points and Authorities, the Declaration of Justin M.

5  Goldstein, the Request for Judicial Notice, the Notice of Lodging, and the pleadings

6  and papers filed in this lawsuit.  Pursuant to Local Rule 7-3, counsel for Defendants

7  engaged in a substantial meet and confer effort, including sending a detailed meet

8  and confer letter to Plaintiff's counsel on March 20, 2017, meeting in-person with

9  counsel for Plaintiff on March 23, 2017 to discuss the substance of this Motion, and

10  conducting follow-up meet and confers by telephone on April 20 and April 24,

11  2017.  (Declaration of Justin M. Goldstein ("Goldstein Decl."), ¶¶ 2, 3, 10.)

12

13  Dated:  May 22, 2017                    CARLSMITH BALL LLP

14

15                                    By: /s/ Justin M. Goldstein
16                                         Justin M. Goldstein
                                          Michelle L. Han
17                                         Attorneys for Defendants
                                          ABC Signature Studios, Inc., Khalabo
18                                         Ink Society, and Kenya Barris

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     PROCEDURAL AND FACTUAL BACKGROUND ................................... 2

     A.      Plaintiff's Complaint ........................................................................ 2

     B.      The Two Works At Issue .................................................................. 3

          1.      Plaintiff's Script, "Across the Tracks" ..................................... 4

          2.      Defendants' Show, *Black-ish* ................................................. 6

III.    LEGAL STANDARD ................................................................................ 9

IV.     ARGUMENT ........................................................................................... 9

     A.      Plaintiff Has Not *And Cannot* Allege Sufficient Facts To Support A Copyright Infringement Claim ........................................... 9

          1.      Plaintiff Fails to Allege In The Complaint That Defendants Copied Any Protectable Elements of "Across the Tracks" ........................................................................... 11

          2.      The Script and *Black-ish* Are Not Substantially Similar .......... 12

               (a)     Theme .......................................................................... 12

               (b)     Plot, Sequence of Events, and Pace .............................. 14

               (c)     Dialogue and Mood ...................................................... 17

               (d)     Characters .................................................................... 19

               (e)     Setting .......................................................................... 22

     B.      Plaintiff's Claim for Unfair Competition Under the Lanham Act Is Barred Under *Dastar* and Its Progeny ........................................... 22

     C.      Plaintiff's Request for Declaratory Relief Should Be Dismissed as Duplicative of His Copyright Infringement Claim .......................... 24

     D.      Plaintiff's Request For Injunctive Relief is Not an Independent Cause of Action ............................................................................. 25

V.      CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alexander v. Murdoch No. 10,*
2011 WL 2802923 (S.D.N.Y. July 14, 2011).......................................................22

*Basile v. Twentieth Century Fox Film Corp.,*
2014 WL 12521340 (C.D. Cal. Aug. 19, 2014) ......................................................4

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ...............................................................................................9

*Benay v. Warner Bros. Entertainment, Inc.,*
607 F.3d 620 (9th Cir. 2010) ................................................................................13

*Berkic v. Crichton,*
761 F.2d 1289 (9th Cir. 1985)..........................................................10, 11, 13, 16

*Biederman v. Northwest Trustee Services, Inc.,*
2015 WL 3889371 (C.D. Cal. June 24, 2015)......................................................25

*Blehm v. Jacobs,*
702 F.3d 1193 (10th Cir. 2012)............................................................................13

*Campbell v. Walt Disney Co.,*
718 F.Supp.2d 1108 (N.D. Cal. 2010)............................................................11, 12

*Cavalier v. Random House, Inc.,*
297 F.3d 815 (9th Cir. 2002)...........................................................................passim

*Christianson v. West Pub. Co.,*
149 F.2d 202 (9th Cir. 1945) ...............................................................................10

*CK Co. v. Burger King Corp.,*
1994 WL 533253 (S.D.N.Y. Sept. 30, 1994) ......................................................20

*Clegg v. Cult Awareness Network,*
18 F.3d 752 (9th Cir. 1994) ...................................................................................9

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003) ......................................................................................1, 23, 24

*DuckHole Inc., v. NBC Universal Media LLC,*
2013 WL 5797279 (C.D. Cal. Sept. 6, 2013)......................................................12

*Eaton v. Nat'l Broadcasting Co.,*
972 F.Supp. 1019 (E.D. Va. 1997) ......................................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.,*
499 U.S. 340 (1991) ...............................................................................................9

*Flaherty v. Filardi,*
388 F.Supp.2d 274 (S.D.N.Y. 2005) ....................................................................18

*Friedman v. Zimmer,*
2015 WL 6164787 (C.D. Cal. July 10, 2015) ......................................................24

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,*
462 F.3d 1072 (9th Cir. 2006)..............................................................................10

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Gallagher v. Lions Gate Entertainment Inc.*,
  2015 WL 12481504 (C.D. Cal. Sept. 11, 2015)..............................17, 18

*Hogan v. DC Comics*,
  48 F.Supp.2d 298 (S.D.N.Y. 1999) ..................................................21

*Kleiman v. Wells Fargo and Co.*,
  2011 WL 13128618 (C.D. Cal. June 23, 2011)..................................25

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994)...........................................9, 10, 17

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ............................................................4

*Rosenfeld v. Twentieth Century Fox Film*,
  2009 WL 212958 (C.D. Cal. Jan. 28, 2009)..................................18, 25

*Schkeiban v. Cameron*,
  2012 WL 5636281 (C.D. Cal. Oct. 4, 2012) ......................................11

*Shame on You Productions, Inc. v. Elizabeth Banks*,
  120 F.Supp.3d 1123 (C.D. Cal. Aug. 14, 2015)..............................18, 22

*Shaw v. Lindheim*,
  919 F.2d 1353 (9th Cir. 1990) ........................................................10

*Silas v. Home Box Office, Inc.*,
  201 F.Supp.3d 1158 (C.D. Cal. 2016), *appeal docketed*,
  No. 16-56215 (9th Cir. Aug. 25, 2016).......................................passim

*Silicon Valley Bank v. New Hampshire Ins. Co.*,
  203 F.Supp.2d 1152 (C.D. Cal. 2002)................................................4

*Smith v. Jackson*,
  84 F.3d 1213 (9th Cir. 1996) ..........................................................10

*Smith v. New Line Cinema*,
  2004 WL 2049232 (S.D.N.Y. Sept. 13, 2004) ..................................24

*Smith v. U.S. Bank Nat'l Ass'n ND*,
  2012 WL 12887913 (C.D. Cal. May 14, 2012)..................................25

*Ticketmaster LLC, v. Prior*,
  2008 WL 649792 (C.D. Cal. Mar. 10, 2008) ....................................24

*Webb v. Stallone*,
  910 F.Supp.2d 681 (S.D.N.Y. 2012) ................................................20

*Weiss v. DreamWorks SKG*,
  2015 WL 12711658 (C.D. Cal. Feb. 9, 2015)....................................24

*Weygand v. CBS Inc.*,
  1997 WL 377980 (C.D. Cal. May 21, 1997) ......................................14

*Williams v. A & E Television Networks*,
  122 F.Supp.3d 157 (S.D.N.Y. 2015)............................................21, 25

*Williams v. UMG Recordings, Inc.*,
  281 F.Supp.2d 1177 (C.D. Cal. 2003) ..............................................23

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**<u>Page</u>**

*Zella v. E.W. Scripps Co.,*
   529 F.Supp.2d 1124 (C.D. Cal. 2007)................................................................ 10

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)

1    <center>**MEMORANDUM OF POINTS AND AUTHORITIES**</center>

2    **I.   <u>INTRODUCTION</u>**

3        Plaintiff David Marcus' Complaint is characteristic of the many frivolous

4    "you stole my idea" claims that federal courts in the Ninth Circuit (and around the

5    country) routinely dismiss at the pleading stage.  Plaintiff alleges only the most

6    generic, non-protectable similarities between his script, "Across the Tracks," and

7    *Black-ish*—many of which on examination of the actual works turn out not to be

8    similarities at all.  And while it is not the subject of this Motion, Plaintiff also

9    alleges only a highly conspiratorial theory for access.[2]

10       The Court gave Plaintiff leave to file his Amended Complaint, but Plaintiff

11   failed to do so.  That amended pleading, however, would have made no difference.

12   As a matter of law, Plaintiff cannot possibly establish that his script and the pilot

13   episode of *Black-ish* are substantially similar, which renders his copyright claim

14   unsustainable.  This is an assessment the Court can and should take up at the

15   pleading stage, and Defendants submitted the two works along with this Motion so

16   that the Court can do so.

17       The Court should likewise dispose of the three other claims in the Complaint

18   (unfair competition under the Lanham Act, declaratory relief, and injunctive relief).

19   Each of these claims is legally deficient under controlling precedent, as even

20   Plaintiff acknowledged by leaving them out of his proposed Amended Complaint.

21       There is no reason to allow this litigation to proceed any further.  It is plainly

22   meritless, and has already consumed far too much of the Court's and the parties'

23   time and resources.  Defendants therefore respectfully submit that the Court should

24   not only dismiss the Complaint, but do so *without* leave to amend.

25

26   [2] Defendants will be filing separately a Motion to Strike and for Sanctions under
Federal Rule of Civil Procedure 11 that addresses Plaintiff and his counsel's

27   wanton refusal to accept the declaration testimony and contemporaneous records
that specifically undermine Plaintiff's sole theory of access.

28

## II.     PROCEDURAL AND FACTUAL BACKGROUND

### A.     Plaintiff's Complaint

Plaintiff alleges that Overbrook Entertainment, Inc. ("Overbrook") and its principal, the famed and award-winning actor/musician Will Smith ("Smith"), conspired to perpetrate a fraud on the creative community.  As detailed in the Complaint, Overbrook and Smith sponsored a script writing contest called "Search for America's Newest Screenwriter."  (Complaint ("Compl.") ¶¶ 9, 41.)  However, rather than representing a legitimate effort by Smith and his company to discover and promote new talent, Plaintiff claims that the contest was a ruse, orchestrated by Smith and others to acquire improperly and then use without attribution or compensation a "treasure trove" of ideas and creative work product from unsophisticated contestants.  (*Id*. ¶¶ 14, 43-45.)  Plaintiff claims to be one such unwitting victim of this supposed Smith-led conspiracy.

Plaintiff alleges that in March 2013, he submitted a script entitled "Across The Tracks" (the "Script") to the contest.  (*Id*. ¶ 10.)  Although Plaintiff elected not to attach the Script to the Complaint, Plaintiff describes it as detailing "in humorous fashion the lives and experiences of an upwardly mobile middle class African American family as they navigated living the American dream." (*Id*. ¶ 11.) Plaintiff further claims that he obtained a copyright for the Script in November 2014.  (*Id*. ¶ 17.)

Plaintiff alleges that roughly six months after he submitted the Script as part of the contest, the television series *Black-ish* appeared on the project development slate for ABC Signature Studios, Inc., and that the series debuted in the fall of 2014.  (*Id*. ¶¶ 18-20.)  Plaintiff does not allege that Overbrook and Smith (or anyone else associated with the contest) were in any way involved with the creation or development of *Black-ish*.  Plaintiff instead alleges (as part of the fraud claim only) that Smith shared the scripts submitted to the contest with defendant Kenya Barris ("Barris").  (*Id*. ¶ 46.)  Barris is credited as the creator of *Black-ish*, and his

company (defendant Khalabo Ink Society) is the producer.  (*Id.* ¶ 18.)  Plaintiff does not allege when or how Smith supposedly shared with Barris the fruits of his "sham" contest, but claims that Barris was at some point given and then exploited the Script as part of creating *Black-ish*.  (*Id.* ¶ 46.)

Plaintiff points to a handful of general ways that his Script resembles the *Black-ish* pilot episode.  According to Plaintiff, the "major characters, thematic points, and plot turns" in the pilot episode were "virtually identical" to those in the Script.  (*Id.* ¶ 19.)  Plaintiff also identifies as shared elements of both *Black-ish* and the Script:  "the juxtaposition of an upwardly mobile African American family moving into a predominantly Anglo community"; certain unidentified "comedic treatment issues faced by each member of the family in that community"; and unstated "characteristics and personality traits" of the characters.  (*Id.* ¶ 21.)[3]

Based on these allegations, Plaintiff asserts copyright infringement, unfair competition (Lanham Act), declaratory relief and injunctive relief claims against all defendants, and a state law fraud claim against Smith and Overbrook (though those two defendants have since been dismissed).  Plaintiff seeks $5 million in compensatory damages, statutory damages, punitive damages (with respect to the fraud claim), and injunctive relief.

**B.    The Two Works At Issue**

Plaintiff did not attach a copy of the Script or the pilot episode of *Black-ish* to his Complaint.  In ruling on a Rule 12(b)(6) motion to dismiss, however, a court may consider materials that are not physically attached to the complaint where "the documents' authenticity . . . is not contested and the plaintiffs' complaint

---

[3] Plaintiff focuses on the pilot episode of *Black-ish* in alleging similarities to his Script, claiming he "watched the pilot for Blackish, and was shocked to realize that all the major characters, thematic points, and plot turns were virtually identical to those of the Script."  (Compl. ¶19.)  Plaintiff's counsel also confirmed this point during meet and confer discussions.  (Declaration of Justin M. Goldstein ("Goldstein Decl."), ¶ 4.)

1   necessarily relies on them." *Basile v. Twentieth Century Fox Film Corp.*, 2014 WL

2   12521340, at *1 (C.D. Cal. Aug. 19, 2014). Here, there is no question that the

3   Complaint relies on both Plaintiff's Script and the pilot episode of *Black-ish*, both

4   of which Defendants have submitted in connection with this Motion.[4]

5          In ruling on this Motion, Defendants urge the Court also to consider

6   Plaintiff's proposed Amended Complaint (attached as Exhibit C to the RJN), where

7   Plaintiff articulates further what similarities he claims to exist between the two

8   works. Though Plaintiff did not separately file it, the proposed Amended

9   Complaint was attached to the parties' April 20, 2017 Stipulation. (Dkt. Nos. 26,

10  26-1.) Thus, it too is subject to judicial notice. *See, e.g., Reyn's Pasta Bella, LLC

11  v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts may "take judicial

12  notice of court filings and other matters of public record"); *Silicon Valley Bank v.

13  New Hampshire Ins. Co.*, 203 F.Supp.2d 1152, 1155 (C.D. Cal. 2002).

14          1.   Plaintiff's Script, "Across the Tracks"

15          The idea in "Across The Tracks" is not a novel concept: how an African-

16  American family confronts racism. Nor is there anything new in the Script itself—

17  much less anything even remotely similar to *Black-ish*. Plaintiff's Script opens

18  with the Johnson family—Dave, his wife Keisha, and their children Kimberly and

19  Dave Junior ("DJ")—pulling up to their new home, which we find out later is just

20  down the road from Dave's used car dealership. (RJN, Ex. A at 2.) The Johnson

21  children are excited to see their new home, but remain uneasy about "leaving their

22  old neighborhood and old friends that looked and talked just like they do" to live in

23  a predominantly white neighborhood. (*Id.*)

24

25  ─────────────────

26  [4] Defendants obtained a copy of the Script from the United States Copyright Office,
    as well as directly from Plaintiff's counsel. (Goldstein Decl., ¶ 4; Request for

27  Judicial Notice ("RJN"), Ex. A.) The pilot episode of *Black-ish* is included in the
    commercially-available DVD of the first season of the series, which is attached as

28  Exhibit B to the RJN and has been lodged with the Court.

As they arrive, the family meets their new neighbors, the Smiths. (*Id.*)  The Smiths—Tim, his wife Katie, and their two sons Lyle and Matty—are established throughout the Script as the other main players in Plaintiff's concept.  The Smiths are white, and serve as the vehicle for confronting the Johnson family with challenges associated with stereotyping and racism.

As they see their neighbors pull up, Tim immediately throws on "some black hip-hop music," Katie makes a lame effort at doing the "Dougie" (a dance she perceives as black-appropriate), and both of them take on "thugged out" mannerisms in body language and speech as they introduce themselves. (*Id.* at 2-3.)  Finding the whole scene absurd, Dave mumbles to his family "to be cool."  And "the Johnson's being a down to earth family that believes in God, [] took it light hearted." (*Id.* at 2, 6.)

Tim and Katie press the stereotyping even further later that day when they arrive for a barbeque at the Johnsons' home.  "Tim is dressed like a gansta [sic] rapper, and Katie looking like a video girl, with her heels and lip gloss popping." (*Id.* at 11.)  Eventually, Tim and Katie both acknowledge how ridiculous they've been, attributing it to just wanting their new neighbors to feel welcome and prove that they weren't prejudiced. (*Id.* at 14.)  Everyone then has a hearty laugh, as Dave comments, "This has to be one of the funniest experiences of my life." (*Id.*)

The family is confronted by even more overt racism the following day.  DJ becomes fast friends with Matty, and is sleeping over at the Smith's home.  That night, Matty's friend Chris tells DJ he's only good at violent video games because "You know about guns right.  You're from the hood aren't you." (*Id.* at 22.)  Chris goes on to suggest that DJ teach them how to dance, and then after hearing that DJ's father owns a used car dealership, Chris declares that "blacks are good salesman anyway they go from pimps to sales.  They even get to the same suit. (sic)  Hood skills pay off for you guys." (*Id.* at 23.)

Once again, the Johnson family confronts racist behavior by relying on their religious faith. Dave commends DJ for his handling of the encounter, explaining "God expects us to do what we are supposed to do, and let him deal with those who offend us." (*Id.*) Dave encourages DJ never to make decisions based on emotion, and says instead he is going to "pray about it" and be with the family "that God blessed me with." (*Id.*)

Plaintiff's Script also quickly and neatly resolves this second brush with racism. That same night, Tim leads Chris and his father, Eric, to the Johnsons' home to make amends. Eric takes responsibility for setting a poor example for his son by making negative comments about the "black manager" who took over the car dealership where he used to work. (*Id.* at 24-25.) Eric receives a round of applause from the room for his contrition. (*Id.* at 25.) Chris then also apologizes to DJ for his insensitive remarks, the two shake hands and all is forgiven. (*Id.*) Dave puts a cap on the encounter by explaining the life lesson for all: "Never prejudge anyone, own up when you're wrong and last but not least, if someone is man enough to own up to his wrongs, you have to be man enough to forgive." (*Id.*)

The going-forward story lines teased by Plaintiff's Script focus on the relationship between the neighboring Johnson and Smith families. Among other things, Keisha is Katie's newly-installed manager, Matty and DJ are friends, and Lyle is introduced as a love interest for Kimberly. Dave is also revealed to have "blessed" Eric with a job at his car dealership.

### 2.   Defendants' Show, *Black-ish*

In contrast to the formulaic approach to race in "Across the Tracks," the treatment of race and culture in *Black-ish* is nuanced. The pilot episode focuses on a father's struggle to "do right" by his family and succeed in his workplace, while at the same time honoring his cultural heritage and instilling in his children an awareness and pride in that history. *Black-ish* opens with a voice-over of the lead character, Andre Johnson, introducing himself and his family—his wife, Rainbow

("Bow"), his four children (two teenagers, Andre Jr. ("Junior") and Zoey, and younger twins, Jack and Diane), and father, "Pops."  Andre explains that he grew up in "the hood," but his and Bow's success have allowed them to raise their family in an upper-class Los Angeles neighborhood.  He laments, however, that "in an effort to make it, black folks have dropped a little bit of their culture and the rest of the world has picked it up," including previous "black man's go-tos" such as R&B and dance.  To his dismay, Andre sees this same dynamic in his own life.

Andre is concerned his children may be over-assimilated into the white community where they were raised.  Dropping off Junior at school, Andre learns both that his son is trying out for the field hockey team rather than playing basketball, and that Junior has encouraged his school friends to call him "Andy" rather than Andre.  Junior also later announces that he'd like to have a Bar Mitzvah instead of a birthday party.  Andre is likewise disturbed by the twins describing their one other black classmate in all ways other than by race.

Andre experiences a different—but equally frustrating—racial dynamic at work.  Andre feels a kinship with the black "family" of workers at his advertising firm, but observes there's a clear divide, with people of color in supporting rather than leadership roles.  As the executive team meets, Andre observes the lower management side of the table is made up of people of color, while the upper management side is all white.  In a fantasy sequence, Andre also imagines the white executives enjoying a veritable Roman orgy of treats, while he and his colleagues are stuck with soda and chips.  But Andre is elated at the prospect of his promotion to what would be his firm's first black Senior Vice President—finally moving a black man over to the white, upper-management, Roman-orgy side of the table.  But when that promotion is announced, he's upset to discover that he is to be Senior Vice President of the firm's new "Urban Division."  Andre comments to himself, "Wait, did they just put me in charge of black stuff?"

1      Andre's frustrations at home and work simmer to a boil, and he calls a family

2  meeting to announce that "I may have to be urban at work, but I'm still going to

3  need my family to be black.  Not 'black-ish,' but black."  Andre proclaims that

4  from now on, they are all going to "keep it real."  At home, Andre's answer is to

5  force Junior to unwillingly participate in an African rite of passage ceremony in full

6  Dashiki garb.  At work, Andre "keeps it real" by creating a Los Angeles tourism ad

7  that focuses on the city's history of racial tensions and violence, to the shock of his

8  coworkers and unamused boss.

9      Bow serves as the moderating force.  She immediately stops the rite of

10  passage ceremony, and as for his workplace frustrations, points out to Andre that

11  "you're upset because they gave you the job because you're black, but if they had

12  given it to someone white, you'd be upset they didn't give it to someone black."

13  Concerned about Andre's behavior, she insists that the "keeping it real BS has got

14  to stop."

15      Andre is further encouraged by conversations with Junior and Pops.  While

16  shooting hoops, Junior acknowledges Andre's concern about his turning into a

17  "white boy," but explains he's just figuring out his own identity.  Junior also notes

18  that he decided to play field hockey because he can make varsity, and that will help

19  him meet girls.  Andre then asks Pops how he "kept it real."  Pops explains that he

20  just "kept it honest," and that making mistakes is part of being a father.

21      Guided by those talks, Andre decides "keeping it real" for him means

22  "admitting that you were wrong, but as a dad still finding a way to be right."  Andre

23  finds "a way to be right" with his family, throwing Junior a "hip hop bro mitzvah"

24  that harmonizes Andre's desire to emphasize cultural identity with Junior's desire

25  for a blow-out party.  Andre also makes it right at work, presenting a much-

26  improved and well-received spot for the Los Angeles tourism account.  *Black-ish*

27  ends with Andre accepting his position as Senior Vice President of the firm's new

28  Urban Division, observing in a voice-over that, "funny thing is, I didn't feel urban.

1  I just felt like a dad that was willing to do whatever he had to for his family.  And

2  isn't that the American Dream?"

3  **III.   LEGAL STANDARD**

4        A motion to dismiss brought under Federal Rule of Civil Procedure

5  ("FRCP") 12(b)(6) tests the legal sufficiency of the claims asserted in the

6  complaint.  A claim may be dismissed if it does not allege facts sufficient to raise a

7  right to the relief requested.  A plaintiff's allegations must rise above the level of

8  mere speculation and must be plausible on their face.  *Bell Atlantic Corp. v.*

9  *Twombly*, 550 U.S. 544, 555-59 (2007).  While for purposes of a motion to dismiss,

10  all allegations of material fact in the complaint are taken as true, a court "is not

11  required to accept legal conclusions cast in the form of actual allegations if those

12  conclusions cannot reasonably be drawn from the facts alleged."  *Clegg v. Cult*

13  *Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

14  **IV.   ARGUMENT**

15       **A.    Plaintiff Has Not *And Cannot* Allege Sufficient Facts To Support A**

16            **Copyright Infringement Claim**

17        To maintain a claim for copyright infringement, a plaintiff must show "(1)

18  ownership of a valid copyright, and (2) copying of constituent elements of the work

19  that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.*, 499 U.S. 340, 361

20  (1991).  Copying may be established by demonstrating (1) "that the [defendant] had

21  access to plaintiff's copyrighted work" and (2) "that the works at issue are

22  substantially similar in their protected elements."  *Cavalier v. Random House, Inc.*,

23  297 F.3d 815, 822 (9th Cir. 2002).

24        The Ninth Circuit employs a two-part test to determine if works are

25  substantially similar:  an intrinsic test and an extrinsic test.  *Id*.  "The 'intrinsic test'

26  is a subjective comparison that focuses on 'whether the ordinary, reasonable

27  audience' would find the works substantially similar in the 'total concept and feel

28  of the works.'"  *Id*. (citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d

1042, 1045 (9th Cir. 1994)).  Because the intrinsic test is a "subjective assessment of the concept and feel of two works," *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990), a determination of two works' intrinsic similarities "must be left to the jury." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

The court, however, must apply an extrinsic test to determine substantial similarity as a matter of law. *Zella v. E.W. Scripps Co*., 529 F.Supp.2d 1124, 1133 (C.D. Cal. 2007).  The extrinsic test "is an objective comparison of specific expressive elements" which seeks to find "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Cavalier*, 297 F.3d at 822 (citing *Kouf*, 16 F.3d at 1045).  In applying the extrinsic test, courts compare "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citing *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)).  Courts must "filter out and disregard [ ] non-protectible elements" of a plaintiff's work and inquire only into "whether the *protectible elements, standing alone*, are substantially similar." *Cavalier*, 297 F.3d at 822 (quotations omitted) (emphasis in original).  "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses . . . because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045.

Moreover, the court may determine substantial similarity in a copyright infringement case as a matter of law at the pleading stage by comparing the two works at issue. *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1130 (C.D. Cal. 2007) ("the Ninth Circuit has noted that '[t]here is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss") (citing *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)).  "For fifty years, courts have followed this rather obvious principle and

1   dismissed copyright claims that fail from the face of the complaint (and in light of

2   all matters properly considered on a motion to dismiss)."  *Id.*

3       Accordingly, courts have dismissed copyright infringement claims at the

4   pleading stage based on their determination that the relevant works were not

5   substantially similar.  *See, e.g., Silas v. Home Box Office, Inc.*, 201 F.Supp.3d 1158

6   (C.D. Cal. 2016), *appeal docketed*, No. 16-56215 (9th Cir. Aug. 25, 2016);

7   *Schkeiban v. Cameron*, 2012 WL 5636281 (C.D. Cal. Oct. 4, 2012).  Because

8   substantial similarity is "a defect that cannot be cured by an amended complaint,"

9   dismissal without leave to amend is proper.  *See Schkeiban*, 2012 WL 5636281, at

10  *1; *Campbell v. The Walt Disney Co.*, 718 F.Supp.2d 1108, 1116 (N.D. Cal. 2010).

11          1.    <u>Plaintiff Fails to Allege In The Complaint That Defendants</u>

12              <u>Copied Any Protectable Elements of "Across the Tracks"</u>

13      In the Complaint, Plaintiff alleges that Defendants "knowingly and willingly

14  infringed and will continue to infringe" Plaintiff's copyright in the Script.  (Compl.

15  ¶ 27.)  While Plaintiff contends that the pilot episode of *Black-ish* is similar to his

16  Script in certain respects, he does not allege the copying of any <u>legally protectable</u>

17  elements.  Instead, Plaintiff points only to generalized ideas and plot concepts that

18  Ninth Circuit courts have uniformly determined to be insufficient to permit a

19  copyright claim to advance past the pleading stage.

20      To illustrate, Plaintiff claims that the two works are similar because both

21  involve "the overarching theme of the juxtaposition of an upwardly mobile African

22  American family moving into a predominately Anglo community."  (Compl. ¶ 21.)

23  That, however, is nothing more than a basic plot idea that copyright law does not

24  protect.  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.1985); *see also Cavalier*,

25  297 F.3d at 824 ("basic plot ideas . . . are not protected by copyright law").  Nor is

26  this general plot idea novel, having been repeatedly explored in film and television

27  series (*The Jeffersons*, *Diff'rent Strokes*, and *The Fresh Prince of Bel-Air*, to name a

28  few).  Courts have routinely found that similar allegations of similarities in general

plot and theme cannot support a copyright infringement claim.  *See, e.g., DuckHole Inc., v. NBC Universal Media LLC*, 2013 WL 5797279, at *7-8 (C.D. Cal. Sept. 6, 2013) (dismissing copyright claim where themes including "David's ineptitude at dating/a social life" and "the interaction between Michael and owners in the clinic lobby" were "too generic to be protectable elements"); *Campbell*, 718 F.Supp.2d at 1113 (dismissing complaint because the "themes of self-reliance and the importance of friendship and teamwork" were "generic and not protectable").

## 2.    The Script and *Black-ish* Are Not Substantially Similar

So that the Court has an opportunity to fully assess whether Plaintiff could under any circumstance sufficiently allege substantial similarity between the works, Defendants do not challenge Plaintiff's copyright claim merely based on the pleading deficiencies.  Instead, Defendants have submitted copies of the works to the Court, ask the Court to take judicial notice of the further allegations of similarity in Plaintiff's proposed Amended Complaint, and based on those materials provide in this Motion a full-blown similarity analysis under Ninth Circuit law. Defendants respectfully submit that a review and assessment of all of these materials make evident that Plaintiff's copyright claim is fatally deficient and should be determinatively dismissed without any further delay.

### (a)    Theme

"A work's theme is its overarching message."  *Silas*, 201 F.Supp.3d at 1180. Plaintiff alleges that the "thematic points" of the Script and the pilot episode of *Black-ish* are "virtually identical" (Compl. ¶ 19; Dkt. 26-1, ¶ 20), but this is plainly wrong for three reasons.

First, what Plaintiff views as "themes" are largely plots.  For example, Plaintiff describes the "overarching theme" of both the Script and pilot episode of *Black-ish* to be "the juxtaposition of an upwardly mobile African American family moving into a predominately Anglo community."  (Compl. ¶ 21; Dkt. 26-1, ¶ 22.); *see also* Dkt. 26-1, ¶ 30.  Plaintiff further alleges in the proposed Amended

1   Complaint that both works share the theme of "the white majority community
2   attempting to appear cool, hip, and at peace with their new African American
3   neighbors."  (Dkt. 26-1, ¶ 30.)  Even if that were true (and it is not), it is not an
4   "overarching message," and therefore is more accurately characterized as
5   descriptions of scenes or the Script's plot.  *See, e.g., Silas*, 201 F.Supp.3d at 1180
6   (finding that the alleged "theme" of "fast paced and lavish lives of professional
7   football players" is actually an underlying plot idea).  What is more, it is nothing
8   more than a basic plot idea that copyright law does not protect.  *See Berkic*, 761
9   F.2d at 1293 ("General plot ideas are not protected by copyright law; they remain
10  forever the common property of artistic mankind.")

11        Second, the other supposed thematic similarities Plaintiff identifies in the
12  proposed Amended Complaint are unprotectable *scenes-a-faire*.  Plaintiff claims,
13  for instance, that both works share the "thematic motif of being the odd family in
14  the neighborhood."  (Dkt. 26-1, ¶ 31.)  But this "fish-out-of-water" device is
15  commonplace, and here flows naturally from the basic premise of an upwardly
16  mobile African-American family living in a predominantly white community.  The
17  same is true of white characters trying to appear "cool" by using slang.  As a result,
18  these elements are not protectable under copyright law.  *See Silas*, 201 F.Supp.3d at
19  1180 ("there is no protection for stock themes or themes that flow necessarily from
20  a basic premise"); *see also Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d
21  620, 627 (9th Cir. 2010) (holding "fish-out-of water" theme naturally arises from
22  two works' shared plot of an American war veteran who travels to Japan).[5]

23  _____
24  [5]  Plaintiff claims the fish-out-of-water theme is reinforced in both works through
    scenes involving people waving.  (Dkt. 26-1, ¶ 31.)  Those scenes, however, are
25  vastly different.  In the Script, the Johnson are waving to their new neighbors as
    they arrive.  (RJN, Ex. A at 3.)  In *Black-ish*, Andre has a fantasy sequence where
26  he imagines a tour bus driving by his house, pointing to his "black family out of
    their natural habitat," as both the family and tourists wave at each other.  The
27  former is a very normal scenario, the latter is comedic absurdism.  The only
    element the two scenes share is the fact that someone is waving, and that is plainly
28  not protectable.  *See, e.g.*, *Blehm v. Jacobs*, 702 F.3d 1193, 1205 (10th Cir. 2012)

1   Likewise, efforts by white characters in both the Script and *Black-ish* to use slang

2   or "act black" arise out of the basic premise of an African-American family living

3   in a predominantly white community.  *See, e.g., Weygand v. CBS Inc.*, 1997 WL

4   377980, at *6 (C.D. Cal. May 21, 1997) (where both works involve the general plot

5   idea of an African-American farmer who takes in a white child, "scenes of racism

6   and the ability to laugh it off" and "individuals making racists [sic] comments to the

7   boy, and his reaction" are unprotectable *scenes-a-faire*).

8        Third, the actual themes of the two works are markedly different.  *Black-ish*

9   is focused on the challenge of remaining true to one's heritage and values—or, as

10  Andre puts it, "keeping it real"—while navigating social and professional

11  opportunities and challenges.  Andre's focus is not how he and his family are

12  perceived by others, but rather how they view *themselves*.  The theme of the Script

13  seems to be the importance of faith and family in confronting racism, and the

14  general difficulty of even well-intentioned members of the white community to

15  embrace African-Americans.  Thus, while both works involve upwardly mobile

16  black families, the actual themes are entirely distinct and this factor weighs strongly

17  in favor of dismissal.

18               (b)    Plot, Sequence of Events, and Pace

19       While Plaintiff claims that "plot turns" in the pilot episode of *Black-ish* were

20  "virtually identical" to those in the Script (Dkt. 26-1, ¶ 20), the actual plot and

21  sequence of events in the two works are not even remotely similar.  The Script

22  opens with the Johnson family pulling up to their new home, and meeting the new

23  next door neighbors, the Smiths.  That opening scene and the main one that follows

24  (the family barbeque) focuses on the Smiths' well-intentioned, but misguided

25  efforts to make their new neighbors feel welcome by "acting black."  Relying on

26

27  (disregarding the "unprotected idea[]" of a "common hand gesture," the peace sign,
    in substantial similarity analysis).

28

their faith, the Johnsons take it in stride, and the Smiths eventually realize they have embarrassed themselves and insulted the Johnsons, and resolve to change their ways. The following day, yet another act of racism occurs, is confronted, and resolved. This time, a family friend of the Smiths, Chris, insults DJ based on his race. In a second mea culpa moment, both Chris and his father apologize, which is warmly received and accepted by the Johnsons. In each instance, it is the white characters who realize they were wrong, learn the lesson, and promise to do better.

It is also clear that the Script is setting up a show devoting considerable focus to the interactions between the Johnsons and Smiths. The two families are neighbors, the wives will be working together, the two younger boys become fast friends, and the Smith's older son is set up as a love interest for the Johnson's daughter.

In stark contrast, *Black-ish* is focused on its lead character, Andre, his family, and his job. There are no neighbor characters in the pilot. The pilot opens with Andre expressing concern about how black culture is generally being diluted and co-opted—a concern that hits home for him in various ways with his family. Andre struggles with what he perceives as the over-assimilation of his children into the predominantly white community where his children were raised. Andre also experiences a perceived blow at work when his expected promotion feels racially tinged. The episode flashes between sequences at Andre's workplace and the family home, with Andre growing more and more frustrated, ultimately leading to his dramatic over-reaction in both settings—the African rites of passage ceremony with Junior and the ill-conceived original version of the Los Angeles tourism spot. With Bow's help, Andre reflects on what he's done and artfully makes amends both to Junior (with the bro mitzvah) and his colleagues (with the new tourism spot).

In short, there is no actual similarity between the plot or sequence of events in the two works. The driving tension is different. The lessons learned are different. How the lessons were learned is different. The characters learning the

lesson are different.  The plot in the Script is focused on the interactions between the Johnsons and their new neighbors, the Smiths.  There are no next-door neighbors in *Black-ish*, and the main storyline concerns interactions *within* the Johnson family rather than with others.  The secondary storyline in *Black-ish* takes place at Andre's office, and in the Script, there are no workplace scenes at all.

In the proposed Amended Complaint, Plaintiff alleges that there are parallel workplace plotlines because in both works one of the adult characters receives a promotion.  (Dkt. 26-1, ¶ 36.)  First, the notion of a workplace success is entirely generic and not protectable under copyright law.  *See Berkic*, 761 F.2d at 1293.  Second, Plaintiff's claim is factually inaccurate.  In *Black-ish*, Andre receives a promotion; in the Script, Keisha gets a new job.  And third, the actual plotlines are very different.  Keisha's new job appears to set up a workplace relationship with Katie Smith, whom she will manage.  (RJN, Ex. A at 17.)  Andre's promotion is not used to set up any relationships between characters, but rather is a source of tension.  Andre initially reacts negatively as part of his larger internal conflict, but eventually accepts the position and succeeds in his new role.[6]

The pace and timeline of events in the two stories are also very different, and likewise weigh in favor of dismissal.  *See Silas*, 201 F.Supp.3d at 1181 ("The timeline of a work is an important factor in determining whether pace is substantially similar.").  The first two-thirds of the Script takes place in a single day, and consists mostly of two scenes—the Johnsons' arrival and the barbeque that evening, with a short transition in between.  The last third is effectively one scene

---

[6]  In the proposed Amended Complaint, Plaintiff also alleges "the first and a major storyline among the children is the son's friendship with a white neighbor."  (Dkt. 26-1, ¶ 33.)  Friendships between boys from African-American and white families flow naturally from the basic premise of an African-American family living in a predominately white community and is thus not protectable.  *See Cavalier*, 297 F.3d at 822.  In addition, the friendship storylines are totally different.  DJ's friendship in the Script is new and with his next-door neighbor.  Junior's friendship in *Black-ish* is already established, and not with a neighbor, but rather with a schoolmate and field hockey teammate.

1   the following evening.  The pace and story is slow and linear, with very few cuts.
2   *Black-ish* is much more fast paced, with lots of cuts, fantasy scenes, and movement
3   between Andre's work and family life.  The pilot episode also takes place over the
4   course of some substantial period of time.  Although the amount of time is unclear,
5   it had to be long enough to prepare for and throw Junior's "bro mitzvah."  Courts
6   have found pace to be affirmatively dissimilar under circumstances like this.  *See,*
7   *e.g., Kouf*, 16 F.3d at 1046 (finding pace to be dissimilar where one story was told
8   in 24 hours, and the other was told over multiple days).

9                    (c)      Dialogue and Mood

10      "In order to support a claim of substantial similarity based on dialogue,
11   'extended similarity of dialogue' must be demonstrated."  *Gallagher v. Lions Gate*
12   *Entertainment Inc.,* 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015).
13   Plaintiff can come nowhere near satisfying this standard.

14      One immediate and obvious difference in dialogue between the two works is
15   the use of voice-overs in *Black-ish*.  Courts have considered this to be a "key
16   difference" in dialogue, weighing against a finding of substantial similarity.  *See*,
17   *e.g., Silas*, 201 F.Supp.3d at 1181.  And it is not as though the use of voice-overs in
18   *Black-ish* is incidental; rather, it is a key element of the show.  Voice-overs are the
19   vehicle for giving the audience a sense of Andre's persona ("your standard, regular,
20   old incredibly handsome, unbelievably charismatic black dude"), help define
21   Andre's relationships ("Even though we were close, my pops had a weird way of
22   showing he loved me, and by weird, I meant he didn't show it at all."), and convey
23   Andre's humorous and sometimes surprising perspective as events unfold.

24      Plaintiff points to a handful of supposed similarities in dialogue in the
25   proposed Amended Complaint, but none of them is persuasive.  Plaintiff claims:
26   (a) Bow's line that her children do not "see color" is similar to the Script's notation
27   that Smith's still "saw color"; and (b) Andre's line "I need my family to be black
28   again at home" is similar to Dave's line "Do you mind being black for a second

1    again . . . ." (Dkt. 26-1, ¶ 35.)  First, the words "saw color" in the Script is not even

2    dialogue.  (RJN, Ex. A at 6.)  Second, "seeing color" and "acting black" are

3    unprotectable "short, stock phrase[s]."  *Shame on You Productions, Inc. v.*

4    *Elizabeth Banks*, 120 F.Supp.3d 1123, 1156 (C.D. Cal. Aug. 14, 2015).

5        Third, the phrases are commonly used to express ideas associated with a

6    person's racial awareness, and thus are not entitled to copyright protection.  *See*

7    *Gallagher,* 2015 WL 12481504, at *10 ("Ordinary words and phrases are not

8    entitled to copyright protection, nor are phrases or expressions conveying an idea

9    typically expressed in a limited number of stereotyped fashions.")  Fourth, the

10   dialogue naturally flows from the basic premise, and for that reason as well is not

11   protectable.  *See Flaherty v. Filardi*, 388 F.Supp.2d 274, 289 (S.D.N.Y. 2005)

12   (noting that where "dialogue follows from 'scenes a faire,' it cannot be the basis for

13   a finding of copyright infringement").  And finally, Plaintiff ignores obvious

14   differences in the dialogue itself.  Andre says he needs his family to be black again

15   out of frustration with what he perceives to be their over-assimilation; Dave, in

16   contrast, asks Tim to be black again to jokingly deflect a personal question, because

17   "we don't ask personal questions this early."  (RJN, Ex. A at 16.)[7]

18       There are also manifest differences with the style and content of dialogue in

19   the Script and *Black-ish*, which is itself relevant, but also highlights the very

20   different moods of the works.  The dialogue in *Black-ish* underscores the

---

21   [7]  Similarly unavailing is Plaintiff's claim that dialogue in both works sets out "a

22   morality tale concerning the ability to learn from a mistake."  (Dkt. 26-1, ¶ 35.)
     Specifically, Plaintiff points to Andre's line that the "lesson we learned today is that

23   a man always admits when he is wrong," and Dave's line that "We can all learn a
     valuable lesson today.  Never prejudge anyone, own up when you're wrong and last

24   but not least, if someone is man enough to own up to his wrongs, you have to be
     man enough to forgive."  (RJN, Ex. A at 25.)  But "[o]rdinary words and phrases,"

25   like "admitting you are wrong" and "lessons learned," are not entitled to copyright
     protection.  *Gallagher*, 2015 WL 12481504, at *10.  Admitting one's mistakes and

26   learning to forgive are also unprotectable, generic ideas.  *See, e.g., Rosenfeld v.
     Twentieth Century Fox Film*, 2009 WL 212958, at *3 (C.D. Cal. Jan. 28, 2009)

27   (finding that morals of good versus evil and the importance of believing in oneself
     and following one's dreams are "general ideas, which are unprotectable").

28

lighthearted mood of the show.  The character interactions flow naturally, feel current, and have a sarcastic edge.  In *Black-ish*, family members make fun of one another in a loving, but irreverent way.  Even the dialogue about race has a comedic touch.  For example, when Andre refers to his biracial wife as having an "omni colored complexion," Bow responds, "If I'm not really black, then can somebody please tell my hair and my ass?"

Conversely, the dialogue in the Script is far more formal, oftentimes unnaturally so.  A few examples:  (a) DJ expresses his anger at racist comments by saying, "I didn't deserve to be talked to like that, nor will I be disrespected at any ones [sic] expense." (RJN, Ex. A at 23); (b) Katie Smith explains to the Johnsons that "We are tired of letting him borrow our vehicle" (*id*. at 16); and (c) the Smith's friend Eric talks about how his anger caused him to "behave in an inappropriate manner" (*id*. at 24).  And though there are a couple of moments of sarcasm, there is a respectful, even wholesome quality to the way the Johnsons in the Script interact.

Dialogue in the Script about race and religion only further reinforces its more somber and serious mood.  The racially insensitive remarks (particularly by Chris) are not said in jest at all, and are used instead as a foundation for the lesson to be learned.  The same applies to the repeated references to religion as a family pillar and guide for their actions.  (*Id*. at 6 ("the Johnson's being a down to earth family that believes in God"), 7 ("God bless their heart"), 21 ("God is good."), 23 ("God expects us to do what we are supposed to do").)  The markedly different moods further weighs in favor of dismissal.  *See, e.g., Cavalier*, 297 F.3d 815, 824-25 (9th Cir. 2002) (finding moods are not substantially similar where one is "fun" and "very lighthearted" and the other is "more serious and instructional").

(d)     Characters

There are obvious, fundamental differences between the characters in the two works.  The principal characters in the Script are Dave and Keisha Johnson, their two children Kimberly and DJ (Dave Jr.), and their neighbors, the Smiths (Tim and

Katie, and their two children Kyle and Matty).  Andre Johnson is the principal character in *Black-ish*, with his wife (Bow) and father (Pops) playing the most significant supporting roles.  Andre and Bow's four children (Zoey, Junior, and the twins, Jack and Diane) are also featured, as are a number of characters from Andre's office.  Thus, at a high level, the family sizes are different, there is no neighbor family in *Black-ish*, there is no grandfather character in the Script, and there is no development of a workplace cast of characters in the Script (other than possibly the Smith's friend, Eric).

Where there is overlap, the characters themselves are also not at all similar.  Andre and Dave are a good illustration.  Andre is a successful advertising executive who values his family and roots, but also can be vain and temperamental.  The storylines in the pilot focus on the lead-up to, and fallout from, Andre's emotional over-reactions.  Dave owns a used car lot, and is calm and religious.  Each time his family confronts a racially-charged moment, it is Dave who counsels everyone to avoid an emotional response, and instead rely on their faith.  (RJN, Ex. A at 23.)

The other characters in the Johnson family are likewise dissimilar.[8]  Given the show's theme, one of Bow's distinguishing features is that she is biracial.  Not so for Keisha.  Keisha's position as a nurse manager appears largely to be a vehicle for creating a workplace relationship with Katie Smith, while there is no corollary for Bow's career as a surgeon.[9]  Like Andre, Bow also has a sarcastic edge that is

---

[8]  That *Black-ish* and the Script both use the "Johnson" family name, and both have son characters who are "juniors" is of no consequence, particularly where (as here) the names used are highly generic.  "The fact that characters have identical names and have similar roles in two works does not necessitate a finding of substantial similarity."  *CK Co. v. Burger King Corp.*, 1994 WL 533253, at *8 (S.D.N.Y. Sept. 30, 1994); *see also Webb v. Stallone*, 910 F.Supp.2d 681, 687 (S.D.N.Y. 2012) (noting that characters with the identical last name of "Garza" are not substantially similar where it is "a common Hispanic surname").  According to the United States Census Bureau, for each of the last three decades "Johnson" has been the second most popular family name—topped only by "Smith" (the other family name used in the Script).  (RJN, Ex. D.)  Moreover, the junior in *Black-ish* goes by "Junior" (or Andy, to his schoolmates), and the junior in the Script goes by "DJ."

[9]  Plaintiff in the proposed Amended Complaint notes that both Bow and Keisha are

1   not seen in either Dave or Keisha.  Keisha (like Dave) also specifically references

2   her faith ("God is really good") (RJN, Ex. A at 21), but the same is not true of Bow.

3       The children in the Script are cut from the same traditional cloth as their

4   parents.  Almost uniformly, DJ and Kimberly are overtly and improbably

5   respectful.  DJ, for example, tells his new friend "me and my sister have the best

6   parents in the world."  (RJN, Ex. A at 8.)  DJ also follows in his proud father's

7   footsteps playing basketball.  (*Id*. at 10-11.)  Kimberly, meanwhile, has learned to

8   cook from her mother, and prepared the family's dinner—earning praise from Dave

9   that "[y]ou gonna make some young man happy one day."  (*Id*. at 20.)

10      The two older children in *Black-ish* bear no resemblance to DJ and Kimberly.

11  Zoey is a feisty teenage girl, whose back-talk to Andre earns her praise from the

12  equally witty and cutting Pops.  It is impossible to imagine the Zoey character

13  making a family dinner, at least willingly.  Nor is there a love interest for Zoey

14  introduced in the *Black-ish* pilot (as there is for Kimberly in the Script).  And

15  Junior's storyline is expressly about finding his own path, which includes his

16  demand for a Bar Mitzvah and trying out for field hockey rather than for basketball

17  (as Andre would prefer).  Junior is also unsurprisingly resistant to Andre's

18  insistence on an African rite of passage ceremony.[10]  There are also no corollaries

19

20  in the medical profession.  (Dkt. 26-1, ¶ 32.)  But "basic human traits that certain
    characters share, including . . . occupation, 'are too general or too common to

21  deserve copyright protection.'"  *Eaton v. Nat'l Broadcasting Co.*, 972 F.Supp.
    1019, 1029 (E.D. Va. 1997).

    [10]  In the proposed Amended Complaint, Plaintiff identifies as similarities that both

22  works include father-son basketball scenes and teenage girls too busy on their
    phones to be involved in family discussions.  (Dkt. 26-1, ¶¶ 33-34.)  But those ideas

23  are generic and flow from the premise of a family comedy.  *See, e.g., Williams v. A
    & E Television Networks*, 122 F.Supp.3d 157, 163 (S.D.N.Y. 2015) (finding

24  activities that would necessarily appear in any show documenting a newly married
    couple's everyday life such as grocery shopping and spending time with friends and

25  family are unprotectable scenes-a-faire); *Hogan v. DC Comics*, 48 F.Supp.2d 298,
    310 (S.D.N.Y. 1999) ("A stock character or basic character type . . . is not entitled

26  to copyright protection.")  Plaintiff also ignores that Dave and DJ are both
    described as skilled basketball players (RJN, Ex. A at 10), whereas Junior jokes

27  about how neither he nor Andre are any good.

28

in the Script to the twins in *Black-ish*.  Thus, as with the other factors, the stark

differences in characters weigh in favor of dismissal.

(e)     Setting

Though it is not clear where the Script takes place (other than in a

"predominantly Anglo community") it would make no difference if it was based in

Los Angeles like *Black-ish*.  *See Alexander v. Murdoch No. 10*, 2011 WL 2802923,

at *7 (S.D.N.Y. July 14, 2011) (finding that the fact that both works were "based in

Los Angeles" was not protectable under copyright law).  Nor would the fact that

both works contain scenes that take place in the family home.  *See Cavalier*, 297

F.3d at 824 ("[S]etting[s] [that] naturally and necessarily flo[w] from the basic plot

premise . . . constitute[s] scenes-a-faire and cannot support a finding of substantial

similarity.").  Conversely, the fact that the Script is set *exclusively* at the Johnsons'

home, while scenes in *Black-ish* are divided fairly equally between the home and

Andre's workplace, with additional scenes sprinkled throughout (*e.g.*, in the car and

at the bro mitzvah), weighs against a finding of substantial similarity.  *See Shame*

*on You Productions, Inc.*, 120 F.Supp.3d at 1161 (fact that some major settings

appear in one work and not the other makes them "strikingly dissimilar," and "cuts

against a finding of substantial similarity.")

In sum, each and every one of the extrinsic test factors weigh strongly

*against* a finding of substantial similarity.  And because this is not a deficiency that

can be addressed through amendment—the works are what they are—Plaintiff's

copyright claim should be dismissed *without* leave to amend.

## B.     Plaintiff's Claim for Unfair Competition Under the Lanham Act Is Barred Under *Dastar* and Its Progeny

Plaintiff's second claim for unfair competition under the Lanham Act is

plainly a repackaged copyright claim.  Plaintiff alleges that "by failing to credit

Plaintiff Marcus and Across the Tracks, the Script upon which Blackish is actually

based, Defendants, and each of them, have made, and will continue to make a false

1  and misleading designation about the origin of this television series in violation of

2  the Lanham Act." (Compl. ¶ 34.)  As the United State Supreme Court has made

3  clear, Lanham Act claims like this one are legally untenable.

4       The Supreme Court in *Dastar Corp. v. Twentieth Century Fox Film Corp.*,

5  539 U.S. 23 (2003) determined that Lanham Act claims for alleged

6  misappropriation of ideas cannot be sustained, and should instead be advanced

7  under copyright law.  In *Dastar*, the defendant purchased videotapes of a television

8  series called "Crusade in Europe," and then used content from that series as part of

9  a new series called "World War II Campaigns in Europe" without giving credit to

10  the creators of "Crusade."  539 U.S. at 25-27.  The creator of "Crusade" sued,

11  alleging that failure to give them credit constituted "reverse passing off" and

12  violated Section 43(a) of the Lanham Act.  *Id.* [11]

13       The Supreme Court assessed the meaning and reach of the Lanham Act's

14  prohibition of false designation of the origin of goods and services, concluding that

15  the phrase "origin of goods" in the Lanham Act "refers to the producer of the

16  tangible goods that are offered for sale, and <u>not to the author of any idea, concept,</u>

17  <u>or communication embodied in those goods</u>." 539 U.S. at 37 (emphasis added).

18  Thus, the Court concluded that litigants cannot use the Lanham Act to seek redress

19  for the alleged misappropriation of ideas and other elements of creative works. *Id*.

20  at 38-39.  Any other result, the Court observed, would cause the "Lanham Act to

21  conflict with the law of copyright, which addresses that subject specifically," and

22  "would not only stretch the text, but [] would be out of accord with the history and

23  purpose of the Lanham Act and inconsistent with precedent." *Id*. at 32-33.

24       Relying on *Dastar*, district courts (including the Central District) have

25  routinely dismissed at the pleading stage Lanham Act claims based on the alleged

26

27

28

---

[11] While the material at issue in *Dastar* had fallen into the public domain, the holding in *Dastar* "is in no way limited to uncopyrighted material." *Williams v. UMG Recordings, Inc.*, 281 F.Supp.2d 1177, 1185 (C.D. Cal. 2003).

1   misappropriation of ideas.  *See*, *e.g., Friedman v. Zimmer,* 2015 WL 6164787, at

2   *3-5 (C.D. Cal. July 10, 2015) (granting motion to dismiss Lanham Act claim

3   based on allegation that movie score infringed plaintiff's copyright to a musical

4   composition); *Weiss v. DreamWorks SKG,* 2015 WL 12711658, at *7 (C.D. Cal.

5   Feb. 9, 2015) (dismissing Lanham Act claim based on the allegation that defendants

6   "stole her ideas," and not that defendants physically repackaged actual copies of her

7   script and offered them for sale under their own name).

8        The Lanham Act claim here is no different.  Plaintiff does not allege that

9   Defendants repackaged as their own any of his *tangible* goods.  Instead, Plaintiff

10  claims that Defendants stole his ideas by using his Script to create *Black-ish*

11  without crediting him.  This is precisely the type of Lanham Act claim that *Dastar*

12  and its progeny make clear is unsustainable as a matter of law.  Because this

13  fundamental legal deficiency cannot be cured through amendment, Defendants urge

14  the Court to dismiss this claim *without* leave to amend.

15       **C.    Plaintiff's Request for Declaratory Relief Should Be Dismissed as**

16  **Duplicative of His Copyright Infringement Claim**

17       Plaintiff's fourth cause of action for declaratory relief serves no independent

18  purpose, and should be dismissed.  Plaintiff requests only a "judicial determination"

19  that Defendants "infringed on Marcus' copyright in Across the Tracks and made

20  use of his idea for a television series."  (Compl. ¶ 54; *see also* Compl. (Prayer for

21  Relief) ¶ 9.)  Whether Defendants infringed Plaintiff's copyright is precisely the

22  same question presented by Plaintiff's copyright infringement claim.

23       Where a party seeks declaratory relief that duplicates a concurrently-pending

24  copyright infringement claim, it should be dismissed.  *See Smith v. New Line*

25  *Cinema*, 2004 WL 2049232, at *5 (S.D.N.Y. Sept. 13, 2004) (declaratory relief

26  claim dismissed as"plainly duplicative of [plaintiff's] copyright infringement

27  claim"); *see also Ticketmaster LLC, v. Prior*, 2008 WL 649792, at *6 (C.D. Cal.

28  Mar. 10, 2008) (dismissing counterclaim for declaratory relief that was duplicative

of defendant's affirmative defense of copyright misuse and thus "a needless waste of judicial resources"). The same analysis and result should apply here.[12]

### D. Plaintiff's Request For Injunctive Relief is Not an Independent Cause of Action

Plaintiff's final claim is for "injunctive relief." (Comp. ¶¶ 58-59.) It is well established, however, that an injunction is a form of relief and not an independent cause of action. *See*, *e.g.*, *Smith v. U.S. Bank Nat'l Ass'n ND*, 2012 WL 12887913, at *2 (C.D. Cal. May 14, 2012) ("Injunctive relief . . . is a judicial remedy, not a cause of action."); *Kleiman v. Wells Fargo and Co.*, 2011 WL 13128618, at *1 (C.D. Cal. June 23, 2011) (same). Claims for "injunctive relief" are therefore subject to dismissal as a matter of law on the pleadings. *See Biederman v. Northwest Trustee Services, Inc.*, 2015 WL 3889371, at *2 (C.D. Cal. June 24, 2015) (dismissing cause of action for injunctive relief because "[i]njunctive relief is a remedy and not, in itself, a cause of action.").

## V. CONCLUSION

For all of these reasons, Defendants respectfully submit that Plaintiff's claims for copyright infringement, unfair competition under the Lanham Act, and declaratory and injunctive relief should all be dismissed without leave to amend.

Dated: May 22, 2017

Respectfully submitted,
CARLSMITH BALL LLP

By: /s/ Justin M. Goldstein
Justin M. Goldstein
Michelle L. Han
Attorneys for Defendants
ABC Signature Studios, Inc., Khalabo
Ink Society, and Kenya Barris

---

[12] Because Plaintiff's request for declaratory relief duplicates his copyright claim, dismissal of the copyright claim would also warrant dismissal of the request for declaratory relief. *See, e.g., Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958, at *4 (C.D. Cal. Jan. 28, 2009); *Williams v. A & E Television Networks*, 122 F.Supp.3d 157, 165 (S.D.N.Y. 2015).