1   JUSTIN M. GOLDSTEIN (SBN 198858)
    jgoldstein@carlsmith.com
2   MICHELLE L. HAN (SBN 285091)
    mhan@carlsmith.com
3   CARLSMITH BALL LLP
    515 South Flower Street, Suite 2900
4   Los Angeles, CA  90071-2901
    Telephone:  213.955.1200
5   Facsimile:   213.623.0032

6   Attorneys for Defendants
    ABC Signature Studios, Inc.,
7   Khalabo Ink Society, and Kenya Barris

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11
    DAVID LLOYD MARCUS, an          Case No. 2:17-cv-00148 RSWL (AJWx)
12  individual,
                                    **DEFENDANTS ABC SIGNATURE
13             Plaintiff,           STUDIOS, INC., KHALABO INK
                                    SOCIETY, AND KENYA BARRIS'
14  v.                              NOTICE OF MOTION AND
                                    MOTION TO STRIKE
15  ABC SIGNATURE STUDIOS, INC., a  PLAINTIFF'S COMPLAINT AND
    Delaware corporation; KHALABO   FOR SANCTIONS PURSUANT TO
16  INK SOCIETY, a Delaware         FED. R. CIV. P. 11;
    corporation; KENYA BARRIS, an   MEMORANDUM OF POINTS AND
17  individual; and DOES 1 through 10,  AUTHORITIES**
    inclusive,
18                                  *Filed Concurrently With*:
               Defendants.         (1) Declaration of Justin M. Goldstein in
19                                      Support of Motion
                                   (2) [Proposed] Order
20
                                   Date:      August 22, 2017
21                                 Time:      10:00 a.m.
                                   Courtroom: TBD
22                                 Judge:     Hon. Ronald S. W. Lew

23

24

25

26

27

28

**TO PLAINTIFF AND ITS ATTORNEYS:**

PLEASE TAKE NOTICE that on August 22, 2017, at 10:00 a.m., or as soon thereafter as the matter can be heard in the above-entitled Court, defendants ABC Signature Studios, Inc., Khalabo Ink Society, and Kenya Barris (collectively, "Defendants") will and hereby do move the Court for an order to strike plaintiff David Lloyd Marcus' ("Plaintiff") Complaint, or alternatively Plaintiff's Amended Complaint if that proposed pleading is filed before this Motion is heard and decided. Defendants also will and hereby move the Court for an order awarding sanctions against Plaintiff pursuant to Federal Rule of Civil Procedure ("FRCP") 11 in an amount to fully reimburse Defendants for their fees and costs incurred in connection with this lawsuit. This Motion is brought on the grounds that Plaintiff filed and is continuing to maintain a frivolous action against Defendants. Plaintiff's sole theory for how Defendants had access to his work (and thereby used it without Plaintiff's authorization) has at all times been unsupported by any factual basis. What is more, Plaintiff was provided with sworn declaration testimony and contemporaneous records that definitively undermines that theory. In addition, the works themselves at issue are markedly dissimilar in all relevant respects.

Defendants' Motion will be based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Justin M. Goldstein, the Request for Judicial Notice filed in support of Defendants' Motion to Dismiss scheduled for hearing on the same date as this Motion (Dkt. No. 36), and the other pleadings and papers filed in this lawsuit. Pursuant to Local Rule 7-3, counsel for Defendants met and conferred extensively with counsel for Plaintiff regarding the substance of this Motion, including by sending a detailed meet and confer letter to Plaintiff's counsel on March 20, 2017, sending further letters to Plaintiff's counsel on April 4 and April 14, 2014, and conducting follow-up meet and confers by telephone on April 20 and April 24, 2017. (Declaration of Justin M. Goldstein ("Goldstein Decl."), ¶¶ 2, 10, 13, 15, Exhs. A, F, G.) After the Court

granted Plaintiff's counsels' Motion to Withdraw, Defendants' counsel also made written requests directly to Plaintiff on June 17, June 22 and July 5, 2017 to meet and confer with him about the substance of the Motion, but Plaintiff declined to make himself available to have any meet and confer discussion.  (Goldstein Decl., ¶¶ 21-24, Exhs. J, K & L.)  Pursuant to Rule 11(c)(2), this Motion was served upon Plaintiff on June 22, 2017 and was not filed until July 17, 2017.

Dated:  July 17, 2017                         CARLSMITH BALL LLP


By: /s/ Justin M. Goldstein
    Justin M. Goldstein
    Michelle L. Han
    Attorneys for Defendants
    ABC Signature Studios, Inc., Khalabo
    Ink Society, and Kenya Barris

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ....................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................... 2

    A.  Plaintiff's Complaint ....................................................................... 2

    B.  Evidence Undermining Plaintiff's Sole Theory of Access ................... 3

    C.  Plaintiff Inexplicably Dismissed Smith and Overbrook Only ............ 5

    D.  Plaintiff's Proposed Amended Complaint and Plaintiff's
        Counsel's Motion to Withdraw .......................................................... 5

III.  LEGAL STANDARD UNDER RULE 11 ................................................. 6

IV.  PLAINTIFF'S COPYRIGHT CLAIM IS FRIVOLOUS ............................. 7

    A.  Plaintiff's Theory Of Access Is Rank Speculation That Flies In
        The Face of Sworn Testimony And Contemporaneous Records ......... 7

    B.  The Works Are Markedly Dissimilar, Both Generally And In
        Their Protectable Elements .............................................................. 10

        1.  Plaintiff's Script, "Across the Tracks" ..................................... 10

        2.  Defendants' Show, *Black-ish* .................................................. 12

        3.  The Script and *Black-ish* Are Not Substantially Similar
            Much Less Strikingly So .................................................... 15

            (a)  Theme ...................................................................... 15

            (b)  Plot, Sequence of Events, and Pace ............................ 17

            (c)  Dialogue and Mood .................................................. 19

            (d)  Characters ................................................................ 22

            (e)  Setting ...................................................................... 24

V.  PLAINTIFF'S OTHER CLAIMS ARE LIKEWISE FRIVOLOUS ........... 25

VI.  CONCLUSION ...................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## CASES

*Alexander v. Murdoch No. 10,*
2011 WL 2802923 (S.D.N.Y. July 14, 2011) ..................................... 24

*Art Attacks Ink, LLC v. MGA Entm't, Inc.,*
581 F.3d 1138 (9th Cir. 2009) ...................................................... 7, 8

*Benay v. Warner Bros. Entertainment, Inc.,*
607 F.3d 620 (9th Cir. 2010) .......................................................... 16

*Berkic v. Crichton,*
761 F.2d 1289 (9th Cir. 1985) .......................................... 15, 17, 18

*Blehm v. Jacobs,*
702 F.3d 1193 (10th Cir. 2012) ...................................................... 16

*Briggs v. Blomkamp,*
70 F.Supp.3d 1155 (N.D. Cal. 2014), *appeal docketed*, No. 14-
17175 (9th Cir. Nov. 3, 2014) .......................................................... 8

*Burger-Moss v. Steinman,*
127 F.R.D. 452 (S.D.N.Y. 1989) ...................................................... 9

*Cavalier v. Random House, Inc.,*
297 F.3d 815 (9th Cir.2002) ............................................ 10, 19, 22, 24

*Christian v. Mattel, Inc.,*
286 F.3d 1118 (9th Cir. 2002) .......................................................... 9

*CK Co. v. Burger King Corp.,*
1994 WL 533253 (S.D.N.Y. Sept. 30, 1994) .................................... 23

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003) ........................................................................... 25

*Eaton v. Nat'l Broadcasting Co.,*
972 F.Supp. 1019 (E.D. Va. 1997) ................................................... 23

*Flaherty v. Filardi,*
388 F.Supp.2d 274 (S.D.N.Y. 2005) ................................................ 20

*Gal v. Viacom Intern., Inc.,*
518 F.Supp.2d 526 (S.D.N.Y. 2007) ................................................ 10

*Gallagher v. Lions Gate Entertainment Inc.,*
2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) .................... 19, 20, 21

*Herron v. Jupiter Transp. Co.,*
858 F.2d 332 (6th Cir. 1988) ............................................................. 7

*Hogan v. DC Comics,*
48 F.Supp.2d 298 (S.D.N.Y. 1999) .................................................. 24

*Kouf v. Walt Disney Pictures & Television,*
16 F.3d 1042 (9th Cir.1994) ............................................................ 19

*Loomis v. Cornish,*
836 F.3d 991 (9th Cir. 2016) ............................................................. 8

1

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Ridder v. City of Springfield*,
  109 F.3d 288 (6th Cir. 1997) .................................................................. 7

*Rosenfeld v. Twentieth Century Fox Film*,
  2009 WL 212958 (C.D. Cal. Jan. 28, 2009) ......................................... 21

*Schwarz v. Meinberg*,
  2016 WL 6126249 (C.D. Cal. Oct. 11, 2016) ........................................ 7

*Shame on You Productions, Inc. v. Elizabeth Banks*,
  120 F.Supp.3d 1123 (C.D. Cal. Aug. 14, 2015) .............................. 20, 25

*Sharp v. Atwood Mobile Products, Inc.*,
  2012 WL 3024726 (S.D. Miss. July 24, 2012) ....................................... 9

*Silas v. Home Box Office, Inc.*,
  201 F.Supp.3d 1158 (C.D. Cal. 2016), *appeal docketed*, No. 16-
  56215 (9th Cir. Aug. 25, 2016) .................................... 15, 16, 19, 20

*Smith v. New Line Cinema*,
  2004 WL 2049232 (S.D.N.Y. Sept. 13, 2004) ...................................... 25

*Smith v. U.S. Bank Nat'l Ass'n ND*,
  2012 WL 12887913 (C.D. Cal. May 14, 2012) ..................................... 25

*Stabile v. Paul Smith Limited*,
  137 F.Supp.3d 1173 (C.D. Cal. July 31, 2015) ................................. 8, 9

*Webb v. Stallone*,
  910 F.Supp. 681 (S.D.N.Y. 2012) ..................................................... 9, 23

*Weygand v. CBS Inc.*,
  1997 WL 377980 (C.D. Cal. May 21, 1997) ......................................... 16

*Williams v. A & E Television Networks*,
  122 F.Supp.3d 157 (S.D.N.Y. 2015) .................................................... 24

*Zella v. E.W. Scripps Co.*,
  529 F.Supp.2d 1124 (C.D. Cal. 2007) .................................................. 10

### STATUTES

Fed. R. Civ. P. 11(c) ................................................................................. 7

### OTHER AUTHORITIES

Rule 11 Notes of Advisory Committee on Rules, 1983 Amendment ....................... 6

Rule 11 Notes of Advisory Committee on Rules, 1993 Amendment ....................... 7

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO STRIKE AND FOR SANCTIONS PURSUANT TO FRCP 11

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   <u>INTRODUCTION</u>

3       Federal Rule of Civil Procedure 11 was designed to provide relief in

4   circumstances just like this.  Plaintiff David Marcus filed this lawsuit with no

5   reasonable factual or legal basis, hoping that discovery might turn up evidence of

6   value, or in the meantime that Defendants would settle to avoid litigation costs.

7   The Court should make clear this type of scheme will not be tolerated.

8       Plaintiff claims that ABC Signature Studios, Inc., Khalabo Ink Society, and

9   Kenya Barris (collectively, "Defendants") used his script to create the pilot episode

10  of the television series *Black-ish*.  But from the start, Plaintiff's sole theory for how

11  Barris got access to his work was beyond far-fetched—that the world-renowned

12  actor Will Smith sponsored a fake contest (run by a third party) to steal ideas from

13  unsuspecting participants, and then passed on Plaintiff's submission to his friend,

14  Barris.  In short order, that theory was completely eviscerated by a sworn

15  declaration from the lead executive overseeing the contest for the third party, who

16  confirmed through testimony and contemporaneous records that Plaintiff's script

17  was never even passed along to Smith or anyone else because it was disqualified

18  from the start.  Because Plaintiff's only access theory depended on Smith receiving

19  and then passing along Plaintiff's script to Barris, this surely should have brought

20  the matter to a close.  Indeed, this evidence caused Plaintiff to dismiss Will Smith

21  and his company from the action and Plaintiff's former counsel to seek leave of the

22  Court to withdraw as counsel.  But still, Plaintiff inexplicably forges on against

23  those parties who had no interaction with him whatsoever.

24      The marked dissimilarities between Plaintiff's script and the pilot episode of

25  *Black-ish* only further underscores that sanctions are warranted.  Plaintiff seems to

26  believe that similarities between the works justifies ignoring the complete lack of

27  access, but in fact, there are no legally protectable similarities at all.  Aside from

28  sharing certain highly generic commonalities, the works are quite different.

Permitting litigants to file and maintain frivolous actions like this without consequence can only have the effect of encouraging more baseless claims in federal court.  Rule 11 empowers the Court to take action here, and Defendants respectfully urge the Court to do so.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Complaint.

Plaintiff filed his complaint against Defendants, as well as Smith and his company Overbrook Entertainment, Inc. ("Overbrook"), asserting copyright infringement, unfair competition, declaratory relief and injunctive relief claims against all defendants, and a state law fraud claim against defendants Smith and Overbrook.  In the complaint ("Compl."), Plaintiff alleged he submitted a script entitled "Across The Tracks" (the "Script") to a script writing contest sponsored by Overbrook and Smith.  (Compl., ¶¶ 9, 41.)  Plaintiff claimed that the contest was a ruse, orchestrated by Smith and others to acquire improperly and then use without attribution or compensation a "treasure trove" of ideas and creative work product from unsophisticated contestants.  (*Id*. ¶¶ 14, 43-45.)

Plaintiff did not allege that Smith or anyone else at Overbrook was involved in the creation, development or production of *Black-ish*.  Instead, Plaintiff alleged that Barris and his company (Khalabo Ink Society) were the ones who improperly used the Script to create *Black-ish* without permission or providing credit.  (*Id*. ¶ 46.)  But there was no allegation that Barris, Khalabo or anyone else who had a hand in creating and producing *Black-ish* were involved in the contest.  Nor was there any allegation that Plaintiff shared the Script with anyone at any time other than submitting it to the contest.  To address this hole, Plaintiff alleged on information and belief that Overbrook/Smith must have given Barris access to scripts submitted to the contest (including Plaintiff's Script), simply because Smith and Barris are friends.  (*Id*. ¶ 46.)  Thus, Plaintiff's sole theory for how anyone involved with *Black-ish* had access to his Script is:  (a) Plaintiff submitted the

1  Script to the contest; (b) Smith/Overbrook received the Script based on being

2  involved with the contest; and (c) Smith then provided Barris access to the Script.

3       Plaintiff alleged that six months after he submitted the Script to the contest,

4  the television series *Black-ish* appeared on the project development slate for ABC

5  Signature Studios, Inc., and that the series debuted in the fall of 2014.  (*Id*. ¶¶ 18-

6  20.)  Plaintiff contended the Script resembles the *Black-ish* pilot episode in certain

7  general respects, including "the juxtaposition of an upwardly mobile African

8  American family moving into a predominantly Anglo community."  (*Id*. ¶ 21.)[1]

9      **B.**   **Evidence Undermining Plaintiff's Sole Theory of Access.**

10       Counsel for Defendants notified Plaintiff's former counsel of its intent to file

11  a motion to dismiss all of the four claims against Defendants.  (Goldstein Decl., ¶

12  2.)  During meet and confer discussions, Plaintiff's former counsel confirmed that

13  their <u>only</u> theory of access was that Smith/Overbrook received a copy of the Script

14  through the contest and then provided it to Barris.  (*Id*., ¶ 4.)  Plaintiff's former

15  counsel reiterated in writing that "the gravamen" of Plaintiff's theory of access was

16  that "Overbrook or an employee of Overbrook, gave a copy of the script to Barris."

17  (*Id*., ¶ 7, Ex. D at 2.)  Plaintiff's former counsel acknowledged "that if the script

18  was never forwarded from the contest gatekeeper to [ANA Alliance, a co-sponsor

19  of the script writing contest] or Overbrook, then we will have a difficult time

20  establishing our access claim."  (*Id*.)  Based on this, Defendants pledged to

21  investigate this theory of access.  (*Id*., ¶ 4.)

22       Shortly thereafter, counsel for Overbrook/Smith provided a sworn

23  Declaration of Richard O'Sullivan, the Vice President of Creative Zing Promotion

24  Group, the company Overbrook hired to set up and manage the scriptwriting

---

[1] Plaintiff alleges that he "watched the pilot episode of Blackish, and was shocked to realize that all the major characters, thematic points, and plot turns were virtually identical to those of the Script."  (Compl. ¶19.)  Plaintiff's former counsel previously confirmed that the similarities Plaintiff alleges between the works are limited to the pilot episode of *Black-ish*.  (Goldstein Decl., ¶ 4.)

1  contest.  (*Id*., Ex. E, Declaration at ¶¶ 1-2.)  Supported by contemporaneous

2  records, O'Sullivan described how he knew Plaintiff's Script never reached

3  Overbrook or Smith (and, thus could not have reached Barris/Khalabo).

4       As O'Sullivan detailed, the script review process began when entrants

5  submitted electronic copies of their scripts to the contest, which were uploaded to a

6  database.  (*Id*. at ¶¶ 5, 7-8.)  The submitted scripts were then subject to a pre-

7  screening review to assess compliance with contest rules.  (*Id*. at ¶ 8.)  At that stage,

8  access to the scripts was limited to O'Sullivan and three other Creative Zing team

9  members.  (*Id*.)  During that stage, submitted scripts were accessible only from

10  devices physically located at the Creative Zing offices following a log-in process

11  and under O'Sullivan's direct supervision.  (*Id*.)  Based on that pre-screening

12  review, a script was either "approved" and advanced to the next phase called "first

13  round judging," or "declined" and disqualified from the contest.  (*Id*.)  Disqualified

14  scripts were assigned a status of "declined" in the database, where access was again

15  limited to Creative Zing employees.  (*Id*. at ¶ 10.)

16       During first round judging, readers (again, not including Smith, or anyone

17  from Overbrook or ANA Alliance) would review on tablets those scripts that had

18  passed pre-screening review and score them according to specific judging criteria.

19  (*Id*. at ¶ 11.)  Based on these scores, the top 50 entries were identified and then

20  provided to Overbrook representatives for judging.  (*Id*.)  Significantly, Plaintiff's

21  Script was not included in the group of 50 scripts that were advanced for review by

22  Overbrook, nor did it even reach first round judging.  (*Id*. at ¶¶ 14-15.)  Rather,

23  Plaintiff's script was *disqualified at the pre-screening stage* for "inappropriate

24  content," and thus was reviewed only by one of three pre-screening reviewers and

25  O'Sullivan.  (*Id*. at ¶¶ 14, 16, Ex. 3.)  Accordingly, the Script "*was never provided*

26  *to, or accessible by, Overbrook, ANA Alliance, first round judges, or Will Smith*."

27  (*Id*. at ¶ 17) (emphasis added).  Thus, in short, Plaintiff's former counsel received

28

1    clear, unequivocal, and under oath evidence from a third party that directly

2    undermined Plaintiff's sole theory of access.

3              **C.      Plaintiff Inexplicably Dismissed Smith and Overbrook Only.**

4              In light of the evidence presented through the O'Sullivan sworn declaration,

5    counsel for Defendants urged Plaintiff's former counsel to dismiss the entire

6    Complaint, observing that "the essential element of access cannot be alleged in

7    good faith because it lacks the evidentiary support, and there is no prospect of ever

8    finding such support." (*Id.*, ¶ 10, Ex. F.)  Plaintiff's former counsel, however,

9    instead elected to dismiss only Overbrook and Smith.  (*Id.*, ¶ 11; Dkt. 25, 28.)  This

10   was inexplicable given the prior—and repeated—confirmation that Plaintiff's only

11   theory for access to the Script by anyone involved with *Black-ish* (including

12   defendants Barris and Khalabo) would have been by way of Smith/Overbrook.

13             **D.      Plaintiff's Proposed Amended Complaint and Plaintiff's Counsel's**

14                      **Motion to Withdraw.**

15             While not agreeing to dismiss the entire action, Plaintiff did agree to drop

16   three of the four claims against Defendants (all but copyright infringement).  (Dkt.

17   26 at 2:22-23.)  Rather than litigate whether Plaintiff should be granted leave to

18   amend, the parties stipulated to the filing of an Amended Complaint.  (Dkt. 26.)

19   Plaintiff's proposed Amended Complaint (Dkt. 26-1) for copyright infringement

20   adds allegations of supposed similarities between the Script and the pilot episode of

21   *Black-ish*.  Plaintiff's access theory, however, remains unchanged.  The only

22   meaningless difference is that Plaintiff alleges the Script or the ideas in the Script

23   may have been negligently passed along to Smith, rather than intentionally.  This

24   ignores entirely the sworn declaration from the person supervising the script review

25   process, who unequivocally confirmed that the Script "was never provided to, or

26   accessible by, Overbrook, ANA Alliance, first round judges, *or Will Smith*."

27   (Goldstein Decl., Ex. E at ¶ 17) (emphasis added).

28

1   The Court ordered Plaintiff to file the Amended Complaint by May 1 .  (Dkt.
2   29).  Plaintiff has not filed the Amended Complaint, and his former counsel stated
3   they did not have authority to do so.  (Goldstein Decl., ¶ 18.)  It appears the
4   O'Sullivan declaration was enough to convince Plaintiff's former counsel the case
5   is meritless.  They filed a Motion to Withdraw, citing to the O'Sullivan declaration
6   (though not by name) as evidence "counsel for plaintiff believes makes the
7   prospects of prevailing upon the complaint very difficult."  (Dkt. 31 at 3:6-12.)
8   Plaintiff's counsel represented that they were in disagreement with Plaintiff about
9   "the effect of the new factual information and evidence," and that disagreement
10  rendered them unable to continue representing Plaintiff.  (*Id.* at 3:12-16.)   The
11  Court granted Plaintiff's counsel's Motion, noting that "Plaintiff has made it
12  unreasonably difficult for Plaintiff's counsel to carry out employment effectively."
13  (Dkt. 40 at 6:10-14.)  Although it is not the operative pleading, Defendants address
14  herein allegations in Plaintiff's proposed Amended Complaint because it provides a
15  detailed outline of the similarities Plaintiff alleges between the works.  Moreover, if
16  Plaintiff is granted leave to file the Amended Complaint before this Motion is
17  decided, Defendants alternatively request that the Amended Complaint be stricken.

18  ## III.   LEGAL STANDARD UNDER RULE 11

19  Rule 11 provides that "[b]y presenting to the court a pleading, written
20  motion, or other paper—whether by signing, filing, submitting, or later advocating
21  it—an attorney or unrepresented party certifies that … (b) the claims, defenses, and
22  other legal contentions are warranted by existing law or by a nonfrivolous argument
23  for extending, modifying, or reversing existing law or for establishing new law"
24  and "(c) the factual contentions have evidentiary support or, if specifically so
25  identified, will likely have evidentiary support after a reasonable opportunity for
26  further investigation or discovery."  Fed. R. Civ. P. 11.  Rule 11 is intended to
27  "discourage dilatory or abusive tactics and help to streamline the litigation process
28  by lessening frivolous claims or defenses."  Notes of Advisory Committee on

1   Rules, 1983 Amendment.  Accordingly, the court may impose sanctions upon a

2   finding that Rule 11 has been violated.  *Schwarz v. Meinberg*, 2016 WL 6126249,

3   at *12 (C.D. Cal. Oct. 11, 2016); *see also* Fed. R. Civ. P. 11(c).  "[A]n attorney and

4   the litigant have a continuing obligation to review and evaluate their pleadings,

5   motions and other papers and upon discovery that such papers were without merit,

6   to immediately dismiss the action at the risk of inviting the imposition of Rule 11

7   sanctions."  *Herron v. Jupiter Transp. Co*., 858 F.2d 332, 336 (6th Cir. 1988).

8   Thus, "litigants may be sanctioned under [Rule 11] for continuing to insist upon a

9   position that is no longer tenable."  *Ridder v. City of Springfield*, 109 F.3d 288, 293

10  (6th Cir. 1997).  *See also* Notes of Advisory Committee on Rules, 1993

11  Amendment ("if evidentiary support is not obtained after a reasonable opportunity

12  to further investigation or discovery, the party has a duty under the rule not to

13  persist with that contention.").

14  **IV.   PLAINTIFF'S COPYRIGHT CLAIM IS FRIVOLOUS**

15          Plaintiff's decision to file and maintain this action was and is wildly

16  irresponsible given the sworn testimony and contemporaneous records eviscerating

17  the already-unsupported, sole theory of access alleged in the Complaint—a theory

18  that relies on a supposed conspiracy involving one of the world's most well-known

19  celebrities.  Plaintiff's rationale seems to be that the similarities between the works

20  are so conspicuous the Script must have somehow been passed along to Barris,

21  despite the evidence confirming otherwise.  But decisions from the Central District,

22  throughout the Ninth Circuit, and around the country make clear that the kinds of

23  similarities Plaintiff alleges are legally unprotectable.  And indeed, much of what

24  Plaintiff alleges to be similar does not withstand even a modest level of scrutiny.

25          **A.   Plaintiff's Theory Of Access Is Rank Speculation That Flies In**

26                 **The Face of Sworn Testimony And Contemporaneous Records**

27          Access is an essential element of a copyright infringement claim, where, as

28  here, direct evidence of copying is absent.  *See Art Attacks Ink, LLC v. MGA*

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

7

1   *Entm't, Inc*., 581 F.3d 1138, 1143 (9th Cir. 2009).  "To prove access, a plaintiff

2   must show a reasonable possibility, not merely a bare possibility, that an alleged

3   infringer had the chance to view the protected work."  *Id*.  "A reasonable

4   opportunity or possibility of viewing consists of more than a 'bare possibility' or

5   'mere speculation or conjecture.'"  *Stabile v. Paul Smith Limited*, 137 F.Supp.3d

6   1173, 1187 (C.D. Cal. July 31, 2015).  To establish access, a plaintiff can rely on

7   circumstantial evidence, including "(1) establishing a chain of events linking the

8   plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work

9   has been widely disseminated."  *Art Attacks Ink, LLC*, 581 F.3d at 1143.

10         While the evidence required to show whether a work has been widely

11  disseminated will vary by case, "[i]n most cases, the evidence of widespread

12  dissemination centers on the degree of a work's commercial success and on its

13  distribution through radio, television, and other relevant mediums."  *Loomis v.*

14  *Cornish*, 836 F.3d 991, 997 (9th Cir. 2016).  Here, Plaintiff does not allege the

15  Script was widely disseminated, and in fact, Plaintiff's former counsel separately

16  acknowledged the Script was submitted only to the contest.  (Goldstein Decl., ¶ 4.)

17  This point is underscored by Plaintiff's continued reliance in the proposed

18  Amended Complaint on the submission to the contest for his access theory.

19  Plaintiff does not allege the Script enjoyed any commercial success or was

20  broadcast to the general public.  Plaintiff's allegations of access are therefore

21  insufficient to establish widespread dissemination.  *See Briggs v. Blomkamp*, 70

22  F.Supp.3d 1155, 1167 (N.D. Cal. 2014), *appeal docketed*, No. 14-17175 (9th Cir.

23  Nov. 3, 2014) (finding that entering screenplay in screenwriting competitions and

24  posting drafts online does not constitute evidence of wide dissemination).

25         Nor is there even a hint of any evidence that would establish a chain of

26  events between the Script and Defendants.  The O'Sullivan declaration totally

27  undermines Plaintiff's the sole theory of access alleged in the Complaint (Compl., ¶

28  46), as well as in the proposed Amended Complaint (Dkt. 26-1, ¶ 18).  In both

1   versions of his pleading, Plaintiff relies on the Script being passed from the contest

2   administrator (Creative Zing) to Smith and then to Barris.  And the O'Sullivan

3   declaration and supporting records confirms that did not happen.  O'Sullivan stated

4   under oath that, because the Script never made it past pre-screening, it "was never

5   provided to, or accessible by, Overbrook, ANA Alliance, first round judges, or Will

6   Smith."  (Goldstein Decl., Ex. E at ¶ 17.)  In the face of such contradictory

7   evidence, Plaintiff must provide more than conjecture about access.  *Stabile*, 137

8   F.Supp.3d at 1187.  But he does not and cannot.

9       Plaintiff seems to assume (despite contrary evidence) that the Script

10  somehow made it to Barris because it resembles the pilot episode of *Black-ish*.  But

11  even if there were legally protectable similarities between the works (and there are

12  not), such rank speculation about access would be is insufficient.  *See Webb v.*

13  *Stallone*, 910 F.Supp. 681, 686-87 (S.D.N.Y. 2012) (access theory based on

14  submission of screenplay to contest not involving defendant was mere speculation).

15      "Rule 11 requires that any factual statements be supported by evidence

16  known to the pleader, or, when specifically so identified, will likely have

17  evidentiary support after discovery.  There has to be more underlying a complaint

18  than a hope that events happened a certain way."  *Sharp v. Atwood Mobile*

19  *Products, Inc.*, 2012 WL 3024726, at *2 (S.D. Miss. July 24, 2012).  Moreover, in a

20  copyright action, there is "an *obligation* not to further multiply the proceedings"

21  when it is clear access cannot be established.  *Burger-Moss v. Steinman*, 127 F.R.D.

22  452, 453-54 (S.D.N.Y. 1989); *see also Christian v. Mattel, Inc.*, 286 F.3d 1118,

23  1128 (9th Cir. 2002) (plaintiff's copyright claim was frivolous and sanctionable

24  under Rule 11 where it was impossible to prove access).  There was no basis to file

25  the Complaint, and surely all claims should have been immediately dismissed once

26  Plaintiff received the O'Sullivan declaration.  Plaintiff's conduct warrants sanctions

27  under Rule 11.

28

**B.**   **The Works Are Markedly Dissimilar, Both Generally And In Their Protectable Elements.**

In addition to access, a plaintiff claiming copyright infringement must show "that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).  The Ninth Circuit employs both an intrinsic and extrinsic test to determine if works are substantially similar.  *Id*.  While the intrinsic test focuses on a subjective comparison often left for the jury, courts apply an extrinsic test to determine substantial similarity as a matter of law.  *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1133 (C.D. Cal. 2007).  In doing so, the court "filter[s] out and disregard[s] the non protectible elements" and instead makes "an objective comparison of specific expressive elements," focusing on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works."  *Cavalier*, 297 F.3d at 822-23 (citations omitted).

Absent evidence of access, Plaintiff must satisfy the even higher burden of showing "that the works are not just 'substantially similar,' but 'strikingly similar.'"  *Gal v. Viacom Intern., Inc.*, 518 F.Supp.2d 526, 537 (S.D.N.Y. 2007).  "Striking similarity exists when two works are so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later was copied from the first."  *Id*.  But most of what Plaintiff points to as supposed similarities are generalities or *scenes-a-faire*, unprotectable under copyright law.  What is more, a reasonable and objective assessment of the two works reveals they are markedly dissimilar in all relevant respects.

1.   Plaintiff's Script, "Across the Tracks"

The idea in "Across The Tracks" is not a novel concept:  how an African-American family confronts racism.  Nor is there anything new in the script itself— much less anything even remotely similar to *Black-ish*.  Plaintiff's script opens with the Johnson family—Dave, his wife Keisha, and their children Kimberly and Dave

10

Junior ("DJ")—pulling up to their new home, which we find out later is just down the road from Dave's used car dealership.  (Dkt. 36 (Request for Judicial Notice in Support of Motion to Dismiss), Ex. A at 2.)  The Johnson children are excited to see their new home, but remain uneasy about "leaving their old neighborhood and old friends that looked and talked just like they do" to live in a predominantly white neighborhood.  (*Id.*)  As they arrive, the family meets their new neighbors, the Smiths.  (*Id.*)  The Smiths—Tim, his wife Katie, and their two sons Lyle and Matty—are established throughout the script as the other main players in Plaintiff's concept.  The Smiths are white, and serve as the vehicle for confronting the Johnson family with challenges associated with stereotyping and racism.

As they see their neighbors pull up, Tim immediately throws on "some black hip-hop music," Katie makes a lame effort at doing the "Dougie" (a dance she perceives as black-appropriate), and both of them take on "thugged out" mannerisms as they introduce themselves.  (*Id*. at 2-3)  Finding the whole scene absurd, Dave mumbles to his family "to be cool."  And "the Johnson's being a down to earth family that believes in God, [] took it light hearted."  (*Id*. at 2, 6.)

Tim and Katie press the stereotyping even further later that day when they arrive for a barbeque at the Johnsons' home.  "Tim is dressed like a gansta [sic] rapper, and Katie looking like a video girl, with her heels and lip gloss popping."  (*Id*. at 11.)  Eventually, Tim and Katie both acknowledge how ridiculous they've been, attributing it to just wanting their new neighbors to feel welcome and prove that they weren't prejudiced.  (*Id*. at 14.)  Everyone then has a hearty laugh, as Dave comments, "This has to be one of the funniest experiences of my life."  (*Id*.)

The family is confronted by even more overt racism the following day.  DJ becomes fast friends with Matty, and is sleeping over at the Smith's home.  That night, Matty's friend Chris tells DJ he's only good at violent video games because "You know about guns right.  You're from the hood aren't you."  (*Id*. at 22.)  Chris goes on to suggest that DJ teach them how to dance, and then after hearing that

1  DJ's father owns a used car dealership, Chris declares that "blacks are good

2  salesman anyway they go from pimps to sales.  They even get to the same suit.

3  (sic)  Hood skills pay off for you guys."  (*Id.* at 23.)  Once again, the Johnson

4  family confronts racism by relying on their faith.  Dave commends DJ for his

5  handling of the encounter, explaining "God expects us to do what we are supposed

6  to do, and let him deal with those who offend us."  (*Id.*)  Dave encourages DJ never

7  to make decisions based on emotion, and says instead he is going to "pray about it"

8  and be with the family "that God blessed me with."  (*Id.*)

9         Plaintiff's script also quickly and neatly resolves this second brush with

10  racism.  That same night, Tim leads Chris and his father, Eric, to the Johnsons'

11  home to make amends.  Eric takes responsibility for setting a poor example for his

12  son by making negative comments about the "black manager" who took over the

13  car dealership where he used to work.  (*Id.* at 24-25.)  Eric receives a round of

14  applause from the room for his contrition.  (*Id.* at 25.)  Chris then also apologizes to

15  DJ for his insensitive remarks, the two shake hands and all is forgiven.  (*Id.*)  Dave

16  puts a cap on the encounter by explaining the life lesson for all:  "Never prejudge

17  anyone, own up when you're wrong and last but not least, if someone is man

18  enough to own up to his wrongs, you have to be man enough to forgive."  (*Id.*)

19         The going-forward story lines teased by Plaintiff's script focus on the

20  relationship between the neighboring Johnson and Smith families.  Among other

21  things, Keisha is Katie's newly-installed manager, Matty and DJ are friends, and

22  Lyle is introduced as a love interest for Kimberly.  Dave is also revealed to have

23  "blessed" Eric with a job at his car dealership.

24                    2.    Defendants' Show, *Black-ish*

25         In contrast to the formulaic approach to race in "Across the Tracks," the

26  treatment of race and culture in *Black-ish* is nuanced.  The pilot episode (Dkt. 36,

27  Ex. B) focuses on a father's struggle to "do right" by his family and succeed in his

28  workplace, while at the same time honoring his cultural heritage and instilling in his

children an awareness and pride in that history.  *Black-ish* opens with a voice-over of the lead character, Andre Johnson, introducing himself and his family—his wife, Rainbow ("Bow"), his four children (two teenagers, Andre Jr. ("Junior") and Zoey, and younger twins, Jack and Diane), and father, "Pops."  Andre explains that he grew up in "the hood," but his and Bow's success have allowed them to raise their family in an upper-class Los Angeles neighborhood.  He laments, however, that "in an effort to make it, black folks have dropped a little bit of their culture and the rest of the world has picked it up," including previous "black man's go-tos" such as R&B and dance.  To his dismay, Andre sees this same dynamic in his own life.

Andre is concerned his children may be over-assimilated into the white community where they were raised.  Dropping off Junior at school, Andre learns both that his son is trying out for the field hockey team rather than playing basketball, and that Junior has encouraged his school friends to call him "Andy" rather than Andre.  Junior also later announces that he'd like to have a Bar Mitzvah instead of a birthday party.  Andre is likewise disturbed by the twins describing their one other black classmate in all ways other than by race.

Andre experiences a different—but equally frustrating—racial dynamic at work.  Andre feels a kinship with the black "family" of workers at his advertising firm, but observes there's a clear divide, with people of color in supporting rather than leadership roles.  As the executive team meets, Andre observes the lower management side of the table is made up of people of color, while the upper management side is all white.  In a fantasy sequence, Andre also imagines the white executives enjoying a veritable Roman orgy of treats, while he and his colleagues are stuck with soda and Cheetos.  But Andre is elated at the prospect of his promotion to what would be his firm's first black Senior Vice President—finally moving a black man over to the white, upper-management, Roman-orgy side of the table.  But when that promotion is announced, he's upset to discover that he is to be

1  Senior Vice President of the firm's new "Urban Division."  Andre comments to

2  himself, "Wait, did they just put me in charge of black stuff?"

3      Andre's frustrations at home and work simmer to a boil, and he calls a family

4  meeting to announce that "I may have to be urban at work, but I'm still going to

5  need my family to be black.  Not 'black-ish,' but black."  Andre proclaims that

6  from now on, they are all going to "keep it real."  At home, Andre's answer is to

7  force Junior to unwillingly participate in an African rite of passage ceremony.  At

8  work, Andre "keeps it real" by creating an LA tourism ad focusing on the city's

9  racial tensions and violence, to the shock of his coworkers and unamused boss.

10      Bow serves as the moderating force, immediately stopping the rite of passage

11  ceremony.  As for his workplace frustrations, Bow points out to Andre that "you're

12  upset because they gave you the job because you're black, but if they had given it to

13  someone white, you'd be upset they didn't give it to someone black."  Concerned

14  about Andre's behavior, she insists the "keeping it real BS has got to stop."

15      Andre is further encouraged by conversations with Junior and Pops.  While

16  shooting hoops, Junior acknowledges Andre's concern about his turning into a

17  "white boy," but explains he's just figuring out his own identity.  Junior also notes

18  that he decided to play field hockey because he can make varsity, and that will help

19  him meet girls.  Andre then asks Pops how he "kept it real."  Pops explains that he

20  just "kept it honest," and that making mistakes is part of being a father.

21      Guided by those talks, Andre decides "keeping it real" for him means

22  "admitting that you were wrong, but as a dad still finding a way to be right."  Andre

23  finds "a way to be right" with his family, throwing Junior a "hip hop bro mitzvah"

24  that harmonizes Andre's desire to emphasize cultural identity with Junior's desire

25  for a blow-out party.  Andre also makes it right at work, presenting a much-

26  improved and well-received spot for the Los Angeles tourism account.  *Black-ish*

27  ends with Andre accepting his position as Senior Vice President of the firm's new

28  Urban Division, observing in a voice-over that, "funny thing is, I didn't feel urban.

1  I just felt like a dad that was willing to do whatever he had to for his family.  And

2  isn't that the American Dream?"

3          3.    <u>The Script and *Black-ish* Are Not Substantially Similar Much</u>

4              <u>Less Strikingly So</u>

5          (a)    Theme

6       "A work's theme is its overarching message."  *Silas v. Home Box Office,*

7  *Inc.*, 201 F.Supp.3d 1158, 1180 (C.D. Cal. 2016), *appeal docketed*, No. 16-56215

8  (9th Cir. Aug. 25, 2016).  Plaintiff alleges that the "thematic points" of the Script

9  and the pilot episode of *Black-ish* are "virtually identical" (Compl. ¶ 19; Dkt. 26-1,

10  ¶ 20), but this is plainly wrong for three reasons.  First, what Plaintiff views as

11  "themes" are largely plots.  For example, Plaintiff describes the "overarching

12  theme" of both the Script and pilot episode of *Black-ish* to be "the juxtaposition of

13  an upwardly mobile African American family moving into a predominately Anglo

14  community."  (Compl. ¶ 21; Dkt. 26-1, ¶¶ 22, 30.)  Plaintiff further alleges in the

15  proposed Amended Complaint that both works share the theme of "the white

16  majority community attempting to appear cool, hip, and at peace with their new

17  African American neighbors."  (Dkt. 26-1, ¶ 30.)  Even if that were true (and it is

18  not), this is not an "overarching message," and therefore is more accurately

19  characterized as part of the Script's plot.  *See, e.g., Silas*, 201 F.Supp.3d at 1180

20  (finding that the alleged "theme" of "fast paced and lavish lives of professional

21  football players" is actually an underlying plot idea).  Copyright law also does not

22  protect such basic plot ideas.  *See Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.

23  1985) ("General plot ideas are not protected by copyright law; they remain forever

24  the common property of artistic mankind.").

25       Second, the other supposed thematic similarities Plaintiff identifies in the

26  proposed Amended Complaint are unprotectable *scenes-a-faire*.  Plaintiff claims,

27  for instance, that both works share the "thematic motif of being the odd family in

28  the neighborhood."  (Dkt. 26-1, ¶ 31.)  But this "fish-out-of-water" device is

commonplace, and here flows naturally from the basic premise of an upwardly mobile African-American family living in a predominantly white community.  The same is true of white characters trying to appear "cool" by using slang.  As a result, these elements are not protectable under copyright law.  *See Silas*, 201 F.Supp.3d at 1180 ("there is no protection for stock themes or themes that flow necessarily from a basic premise"); *see also Benay v. Warner Bros. Entertainment, Inc*., 607 F.3d 620, 627 (9th Cir. 2010) (holding "fish-out-of water" theme naturally arises from two works' shared plot of an American war veteran who travels to Japan).[2] Likewise, efforts by white characters in both the Script and *Black-ish* to use slang or "act black" arise out of the basic premise of an African-American family living in a predominantly white community.  *See, e.g., Weygand v. CBS Inc.*, 1997 WL 377980, at *6 (C.D. Cal. May 21, 1997) (where both works involve the general plot idea of an African-American farmer who takes in a white child, "scenes of racism and the ability to laugh it off" and "individuals making racists [sic] comments to the boy, and his reaction" are unprotectable *scenes-a-faire*).

Third, the actual themes of the two works are markedly different.  *Black-ish* is focused on the challenge of remaining true to one's heritage and values—or, as Andre puts it, "keeping it real"—while navigating social and professional opportunities and challenges.  Andre's focus is not how he and his family are perceived by others, but rather how they view *themselves*.  The theme of the Script seems to be the importance of faith and family in confronting racism, and the

---

[2]  Plaintiff claims the fish-out-of-water theme is reinforced in both works through scenes involving people waving.  (Dkt. 26-1, ¶ 31.)  Those scenes, however, are vastly different.  In the Script, the Johnsons are waving to their new neighbors as they arrive.  (Dkt. 36, Ex. A at 3.)  In *Black-ish*, Andre has a fantasy sequence where he imagines a tour bus driving by his house, pointing to his "black family out of their natural habitat," as both the family and tourists wave at each other.  The former is a very normal scenario, the latter is comedic absurdism.  The only element the two scenes share is the fact that someone is waving, and that is plainly not protectable.  *See, e.g., Blehm v. Jacobs*, 702 F.3d 1193, 1205 (10th Cir. 2012) (disregarding the "unprotected idea[]" of a "common hand gesture," the peace sign, in substantial similarity analysis).

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4846-1563-0918.3

1   general difficulty of even well-intentioned members of the white community to

2   embrace African-Americans.  Thus, while both works involve upwardly mobile

3   black families, the actual themes are entirely distinct.

4                    (b)    Plot, Sequence of Events, and Pace

5           Plaintiff claims that "plot turns" in the pilot episode of *Black-ish* were

6   "virtually identical" to those in the Script.  (Compl. ¶ 19; Dkt. 26-1, ¶ 20.)  As an

7   initial matter, the plot device of "an upwardly mobile African American family

8   moving into a predominately Anglo community" (Compl. ¶ 21) is a general idea not

9   protected by copyright law.  *See Berkic*, 761 F.2d at 1293.  Nor is this idea at all

10  novel, having been repeatedly explored in film and television (*e.g.*, *The Jeffersons*,

11  *Diff'rent Strokes*, and *The Fresh Prince of Bel-Air*).

12          What is more, the actual plot and sequence of events in the two works are not

13  even remotely similar.  The Script opens with the Johnson family pulling up to their

14  new home, and meeting the new next door neighbors, the Smiths.  That opening

15  scene and the main one that follows (the family barbeque) focuses on the Smiths'

16  well-intentioned, but misguided efforts to make their new neighbors feel welcome

17  by "acting black."  Relying on their faith, the Johnsons take it in stride, and the

18  Smiths eventually realize they have embarrassed themselves and insulted the

19  Johnsons, and resolve to change their ways.  The following day, yet another act of

20  racism occurs, is confronted, and resolved.  This time, a family friend of the

21  Smiths, Chris, insults DJ based on his race.  In a second mea culpa moment, both

22  Chris and his father apologize, which is warmly received and accepted by the

23  Johnsons.  In each instance, it is the white characters who realize they were wrong,

24  learn the lesson, and promise to do better.

25          It is also clear that the Script is setting up a show devoting considerable focus

26  to interactions between the Johnsons and Smiths.  The two families are neighbors,

27  the wives will be working together, the two younger boys become fast friends, and

28  the Smith's older son is set up as a love interest for the Johnson's daughter.  In stark

contrast, *Black-ish* is focused on its lead character, Andre, his family, and his job. There are no neighbor characters in the pilot.  The pilot opens with Andre expressing concern about how black culture is generally being diluted and co-opted—a concern that hits home for him in various ways with his family.  Andre struggles with what he perceives as the over-assimilation of his children into the predominantly white community where his children were raised.  Andre also experiences a perceived blow at work when his expected promotion feels racially tinged.  The episode flashes between sequences at Andre's workplace and the family home, with Andre growing more and more frustrated, ultimately leading to his dramatic over-reaction in both settings—the African rites of passage ceremony with Junior and the ill-conceived original version of the Los Angeles tourism spot. With Bow's help, Andre reflects on what he's done and artfully makes amends both to Junior (with the bro mitzvah) and his colleagues (with the new tourism spot).

In short, there is no actual similarity between the plot or sequence of events in the two works.  The driving tension is different.  The lessons learned are different.  How the lessons were learned is different.  The characters learning the lesson are different.  The plot in the Script is focused on the interactions between the Johnsons and their new neighbors, the Smiths.  There are no next-door neighbors in *Black-ish*, and the main storyline concerns interactions *within* the Johnson family rather than with others.  The secondary storyline in *Black-ish* takes place at Andre's office, and in the Script, there are no workplace scenes at all.

In the proposed Amended Complaint, Plaintiff alleges that there are parallel workplace plotlines because in both works one of the adult characters receives a promotion.  (Dkt. 26-1, ¶ 36.)  First, the notion of a workplace success is entirely generic and not protectable under copyright law.  *See Berkic*, 761 F.2d at 1293. Second, Plaintiff's claim is factually inaccurate.  In *Black-ish*, Andre receives a promotion; in the Script, Keisha gets a new job.  And third, the actual plotlines are very different.  Keisha's new job appears to set up a workplace relationship with

1   Katie Smith, whom she will manage.  (Dkt. 36, Ex. A at 17.)  Andre's promotion is

2   not used to set up any relationships between characters, but rather is a source of

3   tension.  Andre initially reacts negatively as part of his larger internal conflict, but

4   eventually accepts the position and succeeds in his new role.[3]

5          The pace and timeline of events in the two stories are also very different, and

6   likewise weigh against a finding of substantial similarity.  *Silas*, 201 F.Supp.3d at

7   1181 ("The timeline of a work is an important factor in determining whether pace is

8   substantially similar.").  The first two-thirds of the Script takes place in a single

9   day, and consists mostly of two scenes—the Johnsons' arrival and the barbeque that

10  evening.  The last third is effectively one scene the following evening.  The pace

11  and story are slow and linear, with very few cuts.  *Black-ish* is fast-paced, with lots

12  of cuts, fantasy scenes, and movement between Andre's work and family life.  The

13  pilot episode also takes place over the course of some substantial period of time.

14  Although the amount of time is unclear, it had to be long enough to prepare for and

15  throw Junior's "bro mitzvah."  Courts have found pace to be affirmatively

16  dissimilar under circumstances like this.  *See, e.g., Kouf v. Walt Disney Pictures &*

17  *Television*, 16 F.3d 1042, 1046 (9th Cir.1994) (finding pace to be dissimilar where

18  one story was told in 24 hours, and the other was told over multiple days).

19                          (c)     Dialogue and Mood

20          "In order to support a claim of substantial similarity based on dialogue,

21  'extended similarity of dialogue' must be demonstrated."  *Gallagher v. Lions Gate*

22

23  _____

24  [3]  In the proposed Amended Complaint, Plaintiff also alleges "the first and a major
    storyline among the children is the son's friendship with a white neighbor."  (Dkt.
    26-1, ¶ 33.)  Friendships between boys from African-American and white families
25  flows naturally from the basic premise of an African-American family living in a
    predominately white community and is thus not protectable.  *See Cavalier*, 297
26  F.3d at 822.  In addition, the friendship storylines are totally different.  DJ's
    friendship in the Script is new and with his next door neighbor.  Junior's friendship
27  in *Black-ish* is already established, and not with a neighbor, but rather with a
    schoolmate and field hockey teammate.

28

1   *Entertainment Inc.,* 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015).

2   Plaintiff can come nowhere near satisfying this standard.

3        One immediate and obvious difference in dialogue between the two works is

4   the use of voice-overs in *Black-ish*.  Courts have considered this to be a "key

5   difference" in dialogue weighing against a finding of substantial similarity.  *See*,

6   *e.g.*, *Silas*, 201 F.Supp.3d at 1181.  And it is not as though the use of voice-overs in

7   *Black-ish* is incidental; rather, it is a key element of the show.  Voice-overs are the

8   vehicle for giving the audience a sense of Andre's persona ("your standard, regular,

9   old incredibly handsome, unbelievably charismatic black dude"), help define

10  Andre's relationships ("Even though we were close, my pops had a weird way of

11  showing he loved me, and by weird, I meant he didn't show it at all."), and convey

12  Andre's humorous and sometimes surprising perspective as events unfold.

13       Plaintiff points to a handful of supposed similarities in dialogue in the

14  proposed Amended Complaint, but none of them is persuasive.  Plaintiff claims:

15  (a) Bow's line that her children do not "see color" is similar to the Script's notation

16  that Smith's still "saw color"; and (b) Andre's line "I need my family to be black

17  again at home" is similar to Dave's line "Do you mind being black for a second

18  again . . . ."  (Dkt. 26-1, ¶ 35.)  First, the words "saw color" in the Script is not even

19  dialogue.  (Dkt. 36, Ex. A at 6.)  Second, "seeing color" and "acting black" are

20  unprotectable "short, stock phrase[s]."  *Shame on You Productions, Inc. v.*

21  *Elizabeth Banks*, 120 F.Supp.3d 1123, 1156 (C.D. Cal. Aug. 14, 2015)).  Third, the

22  phrases are commonly used to express ideas associated with a person's racial

23  awareness, and thus are not entitled to copyright protection.  *See Gallagher*, 2015

24  WL 12481504, at *10 ("Ordinary words and phrases are not entitled to copyright

25  protection, nor are phrases or expressions conveying an idea typically expressed in

26  a limited number of stereotyped fashions.")  Fourth, the dialogue naturally flows

27  from the basic premise, and for that reason as well is not protectable.  *See Flaherty*

28  *v. Filardi*, 388 F.Supp.2d 274, 289 (S.D.N.Y. 2005) (noting that where "dialogue

follows from 'scenes a faire,' it cannot be the basis for a finding of copyright infringement").  And finally, Plaintiff ignores obvious differences in the dialogue itself.  Andre says he needs his family to be black again out of frustration with what he perceives to be their over-assimilation; Dave, in contrast, asks his white neighbor Tim to be black again to jokingly deflect a personal question, because "we don't ask personal questions this early."  (Dkt. 36, Ex. A at 16.)[4]

There are also manifest differences with the style and content of dialogue in the Script and *Black-ish*, which is itself relevant, but also highlights the different moods of the works.  The dialogue in *Black-ish* underscores the show's lighthearted mood.  Character interactions flow naturally, feel current, and have a sarcastic edge.  In *Black-ish*, family members make fun of one another in a loving, but irreverent way.  Even the dialogue about race has a comedic touch.  For example, when Andre refers to his biracial wife as having an "omni colored complexion," Bow responds, "If I'm not really black, then can somebody please tell my hair and my ass?"

Conversely, the dialogue in the Script is far more formal, oftentimes unnaturally so.  A few examples:  (a) DJ expresses his anger at racist comments by saying, "I didn't deserve to be talked to like that, nor will I be disrespected at any ones [sic] expense." (Dkt. 36, Ex. A at 23); (b) Katie Smith explains to the Johnsons that "We are tired of letting him borrow our vehicle" (*id*. at 16); and (c) Eric talks about how his anger caused him to "behave in an inappropriate manner"

---

[4] Similarly unavailing is Plaintiff's claim that dialogue in both works sets out "a morality tale concerning the ability to learn from a mistake."  (Dkt. 26-1, ¶ 35.)  Specifically, Plaintiff points to Andre's line that the "lesson we learned today is that a man always admits when he is wrong," and Dave's line that "We can all learn a valuable lesson today.  Never prejudge anyone, own up when you're wrong and last but not least, if someone is man enough to own up to his wrongs, you have to be man enough to forgive."  (Dkt. 36, Ex. A at 25.)  But "[o]rdinary words and phrases," like "admitting you are wrong" and "lessons learned," are not entitled to copyright protection.  *Gallagher*, 2015 WL 12481504, at *10.  Admitting one's mistakes and learning to forgive are also unprotectable, generic ideas.  *See, e.g., Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958, at *3 (C.D. Cal. Jan. 28, 2009) (finding that morals of good versus evil and the importance of believing in oneself are "general ideas, which are unprotectable").

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4846-1563-0918.3

DEFENDANTS' MOTION TO STRIKE AND FOR SANCTIONS PURSUANT TO FRCP 11

1  (*id*. at 24).  And though there are a couple of moments of sarcasm, there is a

2  respectful, even wholesome quality to the way the Johnsons in the Script interact.

3       Dialogue in the Script about race and religion only further reinforces its more

4  somber and serious mood.  The racially insensitive remarks (particularly by Chris)

5  are not said in jest, and instead serve as the foundation for the lesson to be learned.

6  The same applies to the repeated references to religion as a guide for the family's

7  actions.  (*Id*. at 6 ("the Johnson's being a down to earth family that believes in

8  God"), 7 ("God bless their heart"), 21 ("God is good."), 23 ("God expects us to do

9  what we are supposed to do").)  The markedly different moods further weighs

10  against a finding of substantial similarity.  *See, e.g., Cavalier*, 297 F.3d 815, 824-

11  25 (9th Cir. 2002) (finding moods are not substantially similar where one is "fun"

12  and "very lighthearted" and the other is "more serious and instructional").

13                    (d)    Characters

14       There are obvious, fundamental differences between the characters in the two

15  works.  The principal characters in the Script are Dave and Keisha Johnson, their

16  two children Kimberly and DJ (Dave Jr.), and their neighbors, the Smiths (Tim and

17  Katie, and their children Kyle and Matty).  Andre Johnson is the principal character

18  in *Black-ish*, with his wife (Bow) and father (Pops) playing significant supporting

19  roles.  Andre and Bow's four children (Zoey, Junior, and the twins, Jack and Diane)

20  are also featured, as are characters from Andre's office.  Thus, at a high level, the

21  family sizes are different, there is no neighbor family in *Black-ish*, there is no

22  grandfather character in the Script, and there is no development of a workplace cast

23  of characters in the Script (other than possibly the Smith's friend, Eric).

24       Where there is overlap, the characters themselves are also not at all similar.

25  Andre and Dave are a good illustration.  Andre is a successful advertising executive

26  who values his family and roots, but also can be vain and temperamental.  The

27  storylines in the pilot focus on the lead-up to, and fallout from, Andre's emotional

28  over-reactions.  Dave owns a used car lot, and is calm and religious.  Each time his

1    family confronts a racially-charged moment, it is Dave who counsels against an

2    emotional response, and instead relies on faith.  (Dkt. 36, Ex. A at 23.)

3          The other characters in the Johnson family are likewise dissimilar.[5]  Given

4    the show's theme, one of Bow's distinguishing features is that she is biracial.  Not

5    so for Keisha.  Keisha's position as a nurse manager appears largely to be a vehicle

6    for creating a workspace relationship with Katie Smith, while there is no corollary

7    for Bow's career as a surgeon.[6]  Like Andre, Bow also has a sarcastic edge not

8    seen in either Dave or Keisha.  Keisha (like Dave) also specifically references her

9    faith ("God is really good") (Dkt. 36, Ex. A at 21), but the same is not true of Bow.

10         The children in the Script are cut from the same traditional cloth as their

11   parents.  Almost uniformly, DJ and Kimberly are overtly and improbably

12   respectful.  DJ, for example, tells his new friend "me and my sister have the best

13   parents in the world."  (Dkt. 36, Ex. A at 8.)  DJ also follows in his proud father's

14   footsteps playing basketball.  (*Id*. at 10-11.)  Kimberly, meanwhile, has learned to

15   cook from her mother, and prepared the family's dinner—earning praise from Dave

16   that "[y]ou gonna make some young man happy one day."  (*Id*. at 20.)

17         The two older children in *Black-ish* bear no resemblance to DJ and Kimberly.

18   Zoey is a feisty teenage girl, whose back-talk to Andre earns her praise from the

19   _____

20   [5] That *Black-ish* and the Script both use the "Johnson" family name, and both have
     son characters who are "juniors" is of no consequence, particularly where (as here)
21   the names used are highly generic.  "The fact that characters have identical names
     and have similar roles in two works does not necessitate a finding of substantial
22   similarity."  *CK Co. v. Burger King Corp.*, 1994 WL 533253, at *8 (S.D.N.Y. Sept.
     30, 1994); *see also Webb v. Stallone*, 910 F.Supp.2d 681, 687 (S.D.N.Y. 2012)
23   (noting that characters with the identical last name of "Garza" are not substantially
     similar where it is "a common Hispanic surname").  According to the United States
24   Census Bureau, for each of the last three decades "Johnson" has been the second
     most popular family name—topped only by "Smith" (the other family name used in
25   the Script).  (Dkt. 36, Ex. D.)  Moreover, the junior in *Black-ish* goes by "Junior"
     (or Andy, to his schoolmates) and the junior in the Script goes by "DJ."

26   [6] Plaintiff notes that Bow and Keisha are in the medical profession.  (Dkt. 26-1, ¶
     32.)  But "basic human traits that certain characters share, including . . . occupation,
27   'are too general or too common to deserve copyright protection.'"  *Eaton v. Nat'l
     Broadcasting Co.*, 972 F.Supp. 1019, 1029 (E.D. Va. 1997).

28

1  equally witty and cutting Pops.  It is impossible to imagine the Zoey character

2  making a family dinner, at least willingly.  Nor is there a love interest for Zoey

3  introduced in the *Black-ish* pilot (as there is for Kimberly in the Script).  And

4  Junior's storyline is expressly about finding his own path, which includes his

5  demand for a Bar Mitzvah and trying out for field hockey rather than for basketball

6  (as Andre would prefer).  Junior is also unsurprisingly resistant to Andre's

7  insistence on an African rites of passage ceremony.[7]  There are also no corollaries

8  in the Script to the twins in *Black-ish*.  Thus, as with the other factors, the stark

9  differences in characters weigh against a finding of substantial similarity.

10                          (e)      Setting

11       Though it is not clear where the Script takes place (other than in a

12  "predominantly Anglo community") it would make no difference if it was based in

13  Los Angeles like *Black-ish*.  *See Alexander v. Murdoch No. 10*, 2011 WL 2802923,

14  at *7 (S.D.N.Y. July 14, 2011) (finding that the fact that both works were "based in

15  Los Angeles" was not protectable under copyright law).  Nor would the fact that

16  both works contain scenes that take place in the family home.  *See Cavalier*, 297

17  F.3d at 824 ("[S]etting[s] [that] naturally and necessarily flo[w] from the basic plot

18  premise  . . . constitute[s] scenes-a-faire and cannot support a finding of substantial

19  similarity.").  Conversely, the fact that the Script is set *exclusively* at the Johnsons'

20  home, while scenes in *Black-ish* are divided fairly equally between the home and

21  Andre's workplace, with additional scenes sprinkled throughout (*e.g.*, in the car and

22  _____

23  [7] In the proposed Amended Complaint, Plaintiff also identifies as similarities that both works include father-son basketball scenes and teenage girls too busy on their phones to participate in family discussions.  (Dkt. 26-1, ¶¶ 33-34.)  Those ideas are

24  generic and flow from the premise of a family comedy.  *See, e.g., Williams v. A & E Television Networks*, 122 F.Supp.3d 157, 163 (S.D.N.Y. 2015) (finding activities that would necessarily appear in any show documenting a newly married couple's

25  everyday life such as spending time with friends and family are unprotectable);

26  *Hogan v. DC Comics*, 48 F.Supp.2d 298, 310 (S.D.N.Y. 1999) ("A stock character or basic character type . . . is not entitled to copyright protection.")  Plaintiff also

27  ignores that Dave and DJ are both described as skilled basketball players (Dkt. 36, Ex. A at 10), whereas Junior jokes about how neither he nor Andre are not.

28

1   at the bro mitzvah), weighs against a finding of substantial similarity.  *See Shame*
2   *on You Productions, Inc.*, 120 F.Supp.3d at 1161 (fact that some major settings
3   appear in one work and not the other makes them "strikingly dissimilar," and "cuts
4   against a finding of substantial similarity.")  In sum, each and every one of the
5   extrinsic test factors weigh strongly against a finding of substantial similarity.

6   **V.    PLAINTIFF'S OTHER CLAIMS ARE LIKEWISE FRIVOLOUS**

7          As reflected in the parties' Stipulation and Plaintiff's Proposed Amended
8   Complaint, Plaintiff previously agreed to forego his claims for unfair competition,
9   declaratory relief and injunctive relief.  (Dkt. 26, 26-1.)  And for good reason.  As
10  discussed in the concurrently-pending Motion to Dismiss (pp. 22-25), each of those
11  claims is meritless on the face of the Complaint.  Plaintiff's claim under the
12  Lanham Act for misappropriation of ideas is unsustainable as a matter of law.
13  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 38-39 (2003).
14  Plaintiff's declaratory relief action is likewise unsustainable because it duplicates a
15  concurrently-pending copyright infringement claim.  *Smith v. New Line Cinema*,
16  2004 WL 2049232, at *5 (S.D.N.Y. Sept. 13, 2004).  And Plaintiff's injunctive
17  relief claim must be dismissed because it is not even a claim.  *Smith v. U.S. Bank*
18  *Nat'l Ass'n ND*, 2012 WL 12887913, at *2 (C.D. Cal. May 14, 2012).  Plaintiff
19  acknowledged that these claims were meritless in agreeing to withdraw them from
20  the proposed Amended Complaint, yet he has now failed to authorize the filing of
21  that pleading.  This has wasted both the Defendants' and the Court's resources.

22  **VI.   CONCLUSION**

23         For all of the reasons discussed above, Defendants respectfully request that
24  the Court strike Plaintiff's Complaint, and award sanctions sufficient to reimburse
25  Defendants for their fees and costs incurred in this action in an amount that
26  Defendants will establish through declaration and supporting evidence.

27

28

1    Dated:  July 17, 2017                Respectfully submitted,
2                                         CARLSMITH BALL LLP

3                                         By: /s/ Justin M. Goldstein
                                              Justin M. Goldstein
4                                             Michelle L. Han
                                              Attorneys for Defendants
5                                             ABC Signature Studios, Inc., Khalabo
                                              Ink Society, and Kenya Barris
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4846-1563-0918.3

26

DEFENDANTS' MOTION TO STRIKE AND FOR SANCTIONS PURSUANT TO FRCP 11

**PROOF OF SERVICE BY OVERNIGHT DELIVERY**

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 515 South Flower Street, Suite 2900, Los Angeles, CA  90071-2225.  On July 17, 2017, I deposited with Federal Express, a true and correct copy of the within documents:

    1.   **DEFENDANTS ABC SIGNATURE STUDIOS, INC., KHALABO INK SOCIETY AND KENYA BARRIS' NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFF'S COMPLAINT AND FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11; MEMORANDUM OF POINTS AND AUTHORITIES**

    2.   **DECLARATION OF JUSTIN M. GOLDSTEIN IN SUPPORT OF DEFENDANTS ABC SIGNATURE STUDIOS, INC., KHALABO INK SOCIETY AND KENYA BARRIS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT AND FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

    3.   **[PROPOSED] ORDER RE DEFENDANTS ABC SIGNATURE STUDIOS, INC., KHALABO INK SOCIETY AND KENYA BARRIS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT AND FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

in a sealed envelope, addressed as follows:

    David Lloyd Marcus
    900 Rose Ann Road
    Glen Burnie, MD  21061

Following ordinary business practices, the envelope was sealed and placed for collection by Federal Express on this date, and would, in the ordinary course of business, be retrieved by Federal Express for overnight delivery on this date.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 17, 2017, at Los Angeles, California.

*Gloria Dillard*
Gloria Dillard

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4840-2526-9321.1